IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

KIVA HEALTH BRANDS LLC,

        Plaintiff,

    v.

KIVA BRANDS INC., et al.,

        Defendants.

Case No. 19-cv-03459-CRB

**ORDER DENYING MOTION FOR PRELIMINARY INJUNCTION AND CROSS-MOTION FOR PRELIMINARY INJUNCTION, AND GRANTING MOTION TO DISMISS**

In this trademark case, Plaintiff Kiva Health Brands LLC ("KHB"), a maker of natural foods and health supplements, brings suit against Defendant Kiva Brands Inc. ("KBI"), a maker of cannabis-infused chocolate and other "edibles."  Both companies claim the right to the KIVA mark.  KHB has held a federally-registered trademark in the KIVA mark since 2014.  However, KBI claims to have inherited the KIVA mark from predecessors who have been using it to make cannabis-infused edibles in California since 2010.  Now pending are (1) KHB's Motion for a Preliminary Injunction, see KHB MPI (dkt. 21-1); (2) KHB's Motion to Dismiss two of KBI's counterclaims, see KHB MTD (also dkt. 21-1); and (3) KBI's Cross-Motion for a Preliminary Injunction, see KBI MPI (dkt. 25-1).

Because the Court concludes that neither party has met its burden for a preliminary injunction, the Court DENIES both such motions.  The Court GRANTS KHB's motion to dismiss the two counterclaims in light of KBI's manufacture of a product that is illegal under federal law.

## I.     BACKGROUND

### A.     Plaintiff Kiva Health Brands LLC

Plaintiff KHB is a Nevada corporation, created in 2010, with a principal place of business in Hawaii.  Henderson Decl. (dkt. 21-2) ¶ 2.  KHB distributes and sells "health and wellness foods and food supplements, sourced from farmers that practice sustainable and eco-friendly farming methods."  Id. ¶ 3.  KHB registered the kivahealthbrands.com domain name in 2009, and developed a KIVA logo and its first KIVA product (berry powder) in early 2010.  Id. ¶ 5.  KHB sold KIVA-branded reusable grocery bags as of mid-2010, and sold KIVA-branded food products and food supplements as of February 2013.  Id. ¶¶ 7, 8.  KHB's first online sales were on Amazon.com in June 2013; as of September 2013, KHB also made sales through its website, www.kivahealthfood.com.  Id. ¶ 8.  KHB has been selling continuously using the KIVA mark since 2013, in California, interstate, and internationally.  Id. ¶ 8.

In September 2013, KHB filed an application with the USPTO to register the KIVA mark in connection with food products.  Id. ¶ 9.  The USPTO issued that registration in April 2014.  Id., Ex. A.[1]  In 2015 and 2016, KHB obtained two other trademark registrations for the mark KIVA to be used on additional food and cosmetic products.  Id. ¶ 9, Exs. B and C.[2]

According to KHB's Managing Member, Tchad Henderson, KHB is "associated with quality products, and is well known as a source of safe, healthy, and environmentally friendly food products and food supplements."  Id. ¶ 10.  KHB spent $245,000 in 2016, $720,000 in 2017, and $1,360,000 in 2018 to promote its KIVA-branded products.  Id.

---

[1] "For: Organic Foods, Namely Maqui Berry Powder, and Wheatgrass Powder, in Class 29. . . . For: Organic Foods, Namely, Cacao Powder; Organic Spices, Namely, Saffron, Vanilla, Black Pepper, and Seasoned Salts, in Class 30. . . . The Mark Consists of Standard Characters Without Claim to Any Particular Font, Style, Size, or Color."  Id. Ex. A (Registration No. 4,514,257).
[2] In particular, Registration No. 5,108,487 includes "Class 30: Candy" with a First Use in Commerce of February 15, 2013.  See id. Ex. C.

### B.     Defendant Kiva Brands Inc.

Defendant KBI is a leading provider of cannabis-infused chocolates and confections. Palmer Decl. (dkt. 24-1) ¶ 4. KBI started in November 2010 as a California not-for-profit mutual benefit corporation named Indica. Id. ¶¶ 6, 8. Founders Scott Palmer and Kristi Knoblich brainstormed potential trade names for the company, and decided on "Kiva Confections." Id. ¶ 7, Ex. A. Indica manufactured, sold, and distributed products bearing the names KIVA and/or KIVA CONFECTIONS with permission from Palmer and Knoblich. Id. ¶ 9.

The contract that purports to govern that arrangement is the TM License Agreement, between Palmer and Knoblich, Licensors, on the one hand, and Indica, Licensee, on the other. See id. Ex. B. It states that Licensors own the trademark Kiva and are granting to Licensee "an exclusive, royalty-bearing right and license to use the Licensed Rights in the Territory for the processing, production, and sale of the Products." Id. at 1, 3. The TM License Agreement states that it is "entered into as of November 23, 2010," and also that the Execution Date of the contract is November 23, 2010. See id. Palmer acknowledged in the course of this litigation that the "TM License Agreement was signed in or around October 2018," though he asserts that it "memorialized the agreement that had existed since November 2010." Palmer Decl. ¶ 9B.[3] The TM License Agreement is signed by Palmer and Knoblich, and there is a typewritten signature for "Matt Desano, Director" on behalf of "Indica, Inc. (DBA Kiva Confections)." See id. Ex. B at 20.

Palmer and Knoblich formed KBI in 2014. Palmer Decl. ¶ 10. Palmer asserts that "[b]etween approximately 2014 through 2017, Indica and related entities were reorganized into KBI and its wholly-owned subsidiaries." Id.[4] As part of that reorganization, Palmer

---

[3] Palmer testified in his deposition that it appeared that the license agreement was signed in November 2010. See Miller Decl. (dkt. 21-4) ¶ 8. In subsequent correspondence, Palmer corrected that testimony to say that it was signed around October 2018, effective November 23, 2010. Id., Ex. L

[4] KHB points out that Indica still exists as a California company. KHB Opp'n to KBI (dkt. 28) at 10, Johnson Decl. Ex. 9 (California Secretary of State Business Search Entity Detail of June 5, 2019, showing that Indica is "Active").

and Knoblich transferred "all rights, title, and interest (including but not limited to, all registration rights, all rights to prepare derivative works, all goodwill and all other rights, in and to the intellectual property" to KBI pursuant to an Intellectual Property and Sale Agreement ("IP Sale Agreement") dated October 30, 2014. Id. ¶ 11, Ex. C. That agreement listed the California trademark for KIVA and the trademark application for KIVA among the intellectual property being sold. Id. Schedule A.

Palmer and Knoblich co-founded KBI, Indica, and all of their affiliates. Palmer Decl. ¶ 12. They have been the majority and controlling owners/members since the entities' inception. Id. "The main activity of all of these businesses has always been to manufacture, distribute, and sell and promote 'Kiva Confections' and its products." Id.

Indica made its first sales in Northern California in December 2010, and expanded to Southern and Central California in 2011. Id. ¶ 13. By 2015, KBI was also selling in Arizona, Nevada, Illinois, Hawaii and Michigan. Id. ¶ 14. Palmer declares that since 2010, KBI has used both "KIVA" and "KIVA CONFECTIONS" on its products, and that there has never been a strategic change in how often KBI uses one or the other. Id. ¶ 15. KBI has continuously sold products with the KIVA mark since December 2010. Id. ¶ 18. In that time, KBI has sold millions of units, including 1,705,000 units in California in 2018. Id. It has a marketing budget of $6.5 million for the 2019 year. Id. "Over the past several years," KBI registered the KIVA mark on the state level in California and other states. Id. ¶ 20, Ex. H.[5] A California trademark issued on January 20, 2018 for the mark KIVA for "Chocolate and confections, all of the foregoing containing cannabis," with a date of first use of December 1, 2010. Palmer Decl. Ex. H.

C.    The Conflict Between the Parties

Palmer and KBI first became aware of KHB's use of the KIVA mark in August

---

[5] KBI also filed a USPTO "intent to use" application in 2017, seeking a registration for the KIVA mark for "a website featuring health, wellness and nutrition information . . . all in the field of herbal remedies, medical benefits of cannabis, medical cannabis strains . . . and effects of medic[al] cannabis." See Amended Counterclaim ¶ 28.

2017.  Palmer Decl. ¶ 21.  Henderson and KHB first became aware of KBI in 2015.

Henderson Decl. ¶ 12.  Henderson understood at the time, apparently wrongly, "that [KBI] was selling marijuana-containing products, exclusively or primarily in the San Francisco Bay Area, and that its products were labeled 'Kiva Confections.'"  Id.  Henderson learned "more recently" that KBI was selling some of its products without the "Confections" identifier, and that KBI was selling throughout the state of California and in other states. Id.  In late 2016 or early 2017, KHB became aware that some of its consumers were confusing KHB's brand with KBI's.  Id. ¶ 13.  In January 2017, KHB staff began making a consumer confusion log.  Id., Ex. E.  KHB contends that the consumer confusion is causing KHB "economic damage and injury to its reputation and good will."  Henderson Decl.  ¶ 15.  Henderson asserts that "[KHB's] products are environmentally friendly, unadulterated and healthy, but consumers will be confused by the similar marks, and will likely [] become worried, or erroneously assume, that [KHB's] KIVA-brand food products are infused with marijuana."  Id.

In May 2018, KHB's counsel sent a cease and desist letter to KBI.  Henderson Decl. Ex. F.  KBI responded in May 2018 that it had been making continuous use of the KIVA mark for seven years.  Johnson Decl. Ex. 1 (dkt. 27-1).  It stated that it was not aware of any consumer confusion, but that it nonetheless wished to "take appropriate steps to minimize, if not eliminate[] misdirected contact to KHB."  Id.  KBI asserted that it had common law rights to the mark in California that predated KHB's USPTO registration, suggested that the KHB trademarks were vulnerable, and concluded by seeking "to discuss an amicable resolution."  Id.  KBI wrote to KHB's counsel again in late July 2018.  See Johnson Decl. Ex. 2.  That letter continued to assert KBI's common law rights to the KIVA mark, and stated that a KHB proposal to mediate or arbitrate the dispute "may be premature."  Id.

KHB brought suit in September 2018 for trademark infringement, unfair competition in violation of the Lanham Act, declaratory relief, and unfair and deceptive trade practices under state law.  See generally Compl. (dkt. 1).  It served the Complaint in

December 2018, see Waiver of Service Executed (dkt. 4), after the parties participated in a structured mediation in November and December 2018, see KHB Reply re MPI (dkt. 27) at 4. KBI filed counterclaims. See Counterclaims (dkt. 8); Amended Counterclaims (dkt. 10). KHB then filed for a motion for preliminary injunction in March 2019, seeking to enjoin KBI from any further use of the KIVA mark. See KHB MPI at 18. That same filing includes a motion to dismiss two of KBI's counterclaims. See KHB MTD. In May 2019, KBI filed a cross-motion for preliminary injunction, seeking to enjoin KHB from using the KIVA mark within California. See KBI MPI at 1.

This Court received this case in June when it was transferred in from the Southern District of California. See Case Transferred In (dkt. 31).

## II.      LEGAL STANDARD

A preliminary injunction should issue where the plaintiff establishes that "he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." See Rodriguez v. Robbins, 715 F.3d 1127, 1133 (9th Cir. 2013) (citing Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 20 (2008)). The Ninth Circuit has adopted a "sliding scale approach," such that "'serious questions going to the merits' and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." Alliance for the Wild Rockies v. Cottrell, 632 F.3d 1127, 1134–35 (9th Cir. 2011). The "[l]ikelihood of success on the merits 'is the most important' Winter factor[.]" Disney Enters., Inc. v. VidAngel, Inc., 869 F.3d 848, 856 (9th Cir. 2017).

Motions to dismiss are governed by Federal Rule of Civil Procedure 12(b)(6). Courts adjudicating such motions must ask whether the complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). All material factual allegations must be construed in favor of the non-

moving party. W. Reserve Oil & Gas Co. v. New, 765 F.2d 1428, 1430 (9th Cir. 1985). However, courts "are not bound to accept as true a legal conclusion couched as a factual allegation." Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 555).

## III. DISCUSSION

This Order discusses the three motions now pending: (A) KHB's Motion for a Preliminary Injunction, (B) KHB's Motion to Dismiss two of KBI's counterclaims, and (C) KBI's Cross-Motion for a Preliminary Injunction.

### A. KHB's Motion for Preliminary Injunction

The first and most substantial motion is KHB's Motion for Preliminary Injunction. As discussed below, KHB has not demonstrated that it is likely to succeed on the merits, it has failed to demonstrate irreparable harm, and the balance of the hardships weighs against KHB, although the public interest weighs in its favor. Accordingly, the motion falls short.

#### 1. Likelihood of Success

The first requirement for injunctive relief is a likelihood of success on the merits. See Rodriguez, 715 F.3d at 1133. To prevail on a claim of trademark infringement, a plaintiff must show (a) ownership of a valid mark and (b) use by defendant in commerce of a mark likely to cause consumer confusion. Network Automation, Inc. v. Advanced Sys. Concepts, Inc., 638 F.3d 1137, 1144 (9th Cir. 2011). Both prongs are in dispute here.

##### a. Ownership of the Mark

KHB has three USPTO trademarks for KIVA. See Henderson Decl. Exs. A, B, C (trademarks from 2014, 2015, 2016). A federal trademark registration is prima facie evidence of: (1) the validity of the registered mark; (2) the registration of the mark; (3) the registrant's ownership of the mark; and (4) the registrant's exclusive right to use the registered mark in commerce on or in connection with the goods or services specified. 15 U.S.C. § 1057(b); 3 McCarthy on Trademarks and Unfair Competition, § 19:9 (5th ed. 2018); Rolley, Inc. v. Younghusband, 204 F.2d 209, 211 (9th Cir. 1953). KHB thus argues

that it has shown a protectable ownership interest in the KIVA mark.  KHB MPI at 7.

KBI does not dispute the validity of KHB's trademarks per se; instead, KBI argues that it "has a protectable ownership interest in the KIVA mark under California [common] law dating back to <u>December 2010</u> that covers <u>all</u> of California."  KBI Opp'n to KHB MPI at 18.  KBI contends that its common law right to the KIVA mark in California "precludes an injunction in favor of KHB covering all of California."  <u>See</u> <u>id.</u>  In sum, then: KHB seeks an injunction to prevent KBI from using the KIVA mark anywhere, and KBI challenges KHB's ownership of the KIVA mark in California only.

KHB disputes that KBI has a common law right to the KIVA mark.  <u>See</u> KHB MPI Reply (dkt. 27) at 4.  It does so on two grounds.  First, KHB argues that KBI does not have a valid chain of title in the KIVA mark.  <u>Id.</u> at 4–5.  Second, KHB argues that KBI cannot demonstrate "first use" in commerce because its product is illegal.  <u>Id.</u> at 4–6 (citing <u>Sengoku Works Ltd. v. RMC, Int'l, Ltd.</u>, 96 F.3d 1217, 1219 (9th Cir. 1996) ("To acquire ownership of a trademark it is not enough to have invented the mark first or even to have registered it first; the party claiming ownership must have been the <u>first to actually use the mark</u> in the sale of goods or services.") (emphasis added)).  The second ground is persuasive.

### i.    Chain of Title

KHB's argument as to chain of title is that KBI has only existed since 2014 and so can only claim to have been the first user of the KIVA mark if it has a valid chain of title in the mark before then.  KHB MPI Reply at 4.  KHB notes that the only evidence of chain of title dating back to 2010 is the TM License Agreement.  <u>Id.</u> at 5.  KHB then argues that the TM License Agreement is fatally flawed because, after stating in his deposition that the agreement was signed on November 23, 2010, Palmer later admitted that it "was signed in or around October 2018, effective November 23, 2010.'"  <u>Id.</u>; <u>see also</u> Miller Decl. Ex L (May 2, 2019 letter from KBI counsel submitting errata to deposition transcript); Palmer Decl. ¶ 9B ("The TM License Agreement was signed in or around October 2018, but memorialized the agreement that had existed since November 2010.").  KHB contends that

KBI's admission that the license agreement was signed in 2018, after litigation had begun, "strips it of any significance." See KHB MPI Reply at 5.

KBI correctly responds that a backdated agreement can be valid. See KBI MPI at 4 (citing Du Frene v. Kaiser Steel Corp., 231 Cal. App. 2d 452, 458 (1964) ("a party of a contract may retroactively adopt prior acts or fix retroactive dates of execution for a contract.") and Hotel Corp. of Am. v. Inn Am., Inc., 153 U.S.P.Q. 574, at *5 (T.T.A.B. 1967) (backdated trademark agreements executed during litigation were no less "sufficient on their face to meet the essential requirements of a nunc pro tunc assignment" given "stockholders and officials of the original [applicant] and those of [subsequent corporate form of applicant] were for the most part the same")). Du Frene is not altogether relevant, but like the more recent Raceway Ford Cases, 2 Cal. 5th 161, 175–76 (2016), it suggests that California courts do not reject backdated contracts out of hand. The court in the more factually analogous Hotel Corp. of America observed that nunc pro tunc assignments are intended "to make the record show something which actually occurred, but has been omitted from the record through inadvertence or mistake." 153 U.S.P.Q. at *5.

Even so, this Court would have more confidence that the TM License Agreement was created as a legitimate, backdated agreement had it explicitly stated that it was a nunc pro tunc agreement written in 2018 to reflect what was meant in 2010. That seems to be more akin to what happened in Du Frene, 231 Cal. App. 2d at 458, where the document at issue was a "Change Order" signed by all parties, and stating, "The foregoing [o]rder . . . is hereby approved and accepted as of November 4, 1957," and the Raceway Ford Cases, 2 Cal. 5th at 164, where Raceway Ford would enter into a "subsequent finance contract" with a buyer and backdate the second contract to the date of the first contract. Even the assignments in Hotel Corp. of Am., 153 U.S.P.Q. at *5, appear to have been explicitly nunc pro tunc.

Two further facts undermine the TM License Agreement. First, the TM License Agreement states that "Licensee shall pay Licensors a nonrefundable licensing fee of Twenty-Five Thousand Dollars ($25,000) on the following basis: (a) on the Execution

9

Date, Licensee shall pay to Licensors Fifteen Thousand Dollars ($15,000). . . ." Palmer

Decl. Ex. B ¶ 4.1 ("License Fee"). When asked at his deposition whether he actually

received $15,000 on the day the agreement was made [in 2010], Palmer answered, "Based

on our financial situation at the time it's doubt[ful]. I don't think so." Miller Decl. Ex. L.

He subsequently changed that answer to "I don't think so." <u>Id.</u> Second, the TM License

Agreement bears the handwritten signatures of Knoblich and Palmer, as Licensors, but the

signature for the representative of the Licensee, Indica, was typewritten: it says simply "/s/

Matt Desano, Matt Desano, Director." Palmer Decl. Ex. B at 20. KHB asserts that

"Palmer testified under oath that Matt Desano was a director of Indica who had joined

when it was formed, in 2010, and who had left Indica by 2014 or 2015." KHB Opp'n to

KBI MPI (dkt. 28) at 12 (citing Palmer Depo. at 46–20 to 50–7). If Desano was no longer

at Indica when the TM License Agreement was signed in 2018, then the Court cannot

know that Desano actually agreed to the agreement's terms on behalf of Indica in 2010.[6]

    "If [an] alleged 'senior user' traces rights through an assignment, the assignment is

subject to judicial scrutiny to be sure it was in fact a valid assignment." <u>See</u> McCarthy

§ 26:5; <u>see also</u> <u>Sarieddine v. Alien Visions E-Juice, Inc.</u>, No. CV 18-3658 PA (MAAx),

2019 WL 1966661, at *6 (C.D. Cal. April 12, 2019) (slip op.) ("courts must be cautious in

scenarios that do not involve clear written documents of assignment. Requiring strong

evidence to establish an assignment is appropriate both to prevent parties from using self-

serving testimony to gain ownership of trademarks and to give parties incentive to identify

expressly the ownership of the marks they employ.") (quoting <u>Doeblers' Pa. Hybrids, Inc.</u>

<u>v. Doebler</u>, 442 F.3d 812, 822 (3d Cir. 2006)); <u>TMT N. Am., Inc. v. Magic Touch GmbH</u>,

124 F.3d 876, 884 (7th Cir. 1997) (same).[7] Given the irregularities with the TM License

Agreement, the Court is inclined to reject it as proof of a 2010 assignment of the KIVA

---

[6] KBI answers in its reply that Palmer and Knoblich were controlling members of Indica in 2010 and 2018 "and had authority to enter into agreements on its behalf." KBI Reply re MPI (dkt. 45-1) at 6. But they did not sign their names on Indica's behalf; they signed the name of a former employee who was no longer there. This is no small discrepancy.

[7] KHB incorrectly attributes these quotes to <u>Dep't of Parks & Rec. v. Bazaar Del Mundo, Inc.</u>, 448 F.3d 1118, 1131 (9th Cir. 2006). <u>See</u> KHB MPI at 12; KHB Reply re MPI at 5.

mark from Palmer and Knoblich to Indica.

Nevertheless, KBI argues that "even if the TM License Agreement is invalid . . . a license to use a trademark may be implied by the conduct of the parties." KBI MPI at 5. This is true. "'If there is no documentary evidence of an assignment, it may be proven by the clear and uncontradicted oral testimony of a person in a position to have actual knowledge.'" Sarieddine, 2019 WL 1966661, at *6 (quoting Doeblers' Pa. Hybrids, 442 F.3d at 822); see also Kane on Trademark Law (6th ed. 2018) § 21:2 ("Trademarks, like other forms of property, can be transferred orally or in writing. An oral assignment may be proven by the clear and uncontradicted testimony of a person with knowledge. For ease of proof, of course, you are much better off with a written assignment.").

KBI argues that it has demonstrated an "implied license" between Palmer and Knoblich, and Indica. KBI MPI at 5. To show an implied license, there must be "evidence of an agreement or course of conduct by the parties to contract for a trademark license." Bazaar Del Mundo, Inc. 448 F.3d at 1130. Moreover, "it is imperative for a licensor to have 'maintain[ed] control over the quality of the finished product or service to guarantee to the public that the goods or services are of the same, pre-license quality.'" Henderson v. Lindland, No. CV 11-01350 DDP DTBX, 2013 WL 1181957, at *5 (C.D. Cal. Mar. 21, 2013) (quoting Transgo, Inc. v. Ajac Transmission Parts Corp., 768 F.2d 1001, 1017 (9th Cir. 1985)). Here there was no "pre-license quality," as Palmer and Knoblich never used the KIVA mark in commerce until Indica did so in December 2010, see Palmer Decl. ¶ 13, but no matter, see TAP Mfg., LLC v. Signs, No. 2:15-cv-00797-SVW-PJW, 2015 WL 12752874, at *6 (C.D. Cal. July 23, 2015) (trademark use by licensee "inures to the benefit of the licensor."). Given Palmer's uncontested testimony that the main business of Indica and KBI has always been to sell KIVA confections, that he and Knoblich maintained full control over Indica, KBI, and their affiliates, and that they were the "majority and controlling owners/members since the entities' inception," see Palmer Decl. ¶ 12, there is

probably a sufficient basis to conclude that there was an implied assignment.[8]

Accordingly, while the TM License Agreement does not necessarily demonstrate a valid assignment of the KIVA mark from Palmer and Knoblich to Indica in 2010, the doctrine of implied license likely establishes a chain of title, in California only.

### ii. First Use

KHB's second argument in opposing KBI's assertion of a common law right to the KIVA mark is that one cannot claim first use based on an illegal product. KHB MPI at 12. There is a paucity of trademark authority addressing what happens when a product's legality differs under state and federal law, but what authority there is favors KHB.

To register a trademark, an applicant must show that the mark "is in use in commerce" or that the applicant has a "bona fide intention to use the mark in commerce[.]" 15 U.S.C. § 1051(a)(3)(C); 15 U.S.C. § 1051(b)(3)(B). "[P]riority ordinarily comes with earlier <u>use</u> of a mark in commerce." <u>Grupo Gigante SA De CV v. Dallo & Co., Inc.</u>, 391 F.3d 1088, 1093 (9th Cir. 2004). Importantly, though, the USPTO and the Ninth Circuit have held that the "use in commerce" must be a lawful use. <u>See, e.g.</u>, <u>S. Cal. Darts Ass'n v. Zaffina</u>, 762 F.3d 921, 931 (9th Cir. 2014) ("only <u>lawful</u> use in commerce can give rise to trademark priority"); <u>CreAgri, Inc. v. USANA Health Scis., Inc.</u>, 474 F.3d 626, 630 (9th Cir. 2007) (agreeing with "the PTO's policy . . . that only <u>lawful</u> use in commerce can give rise to trademark priority"); <u>In re Morgan Brown</u>, 119 U.S.P.Q. 2d 1350 (T.T.A.B. July 14, 2016) ("We have consistently held that, to qualify for a federal service mark registration, the use of a mark in commerce must be 'lawful'. . . . Thus, any goods or services for which the mark is used must not be illegal under federal law."). The Ninth Circuit explained that "to hold otherwise would be to put the government in the 'anomalous position' of extending the benefits of trademark protection to a seller based upon actions the seller took in violation of that government's own laws." <u>CreAgri</u>, 474 F.3d at 630 (quoting <u>In re</u>

---

[8] KBI further argues that it has a right to the KIVA mark dating back to 2010 under the "related companies" doctrine. KBI MPI at 5. The Court does not reach this argument.

Stellar Int'l, 159 U.S.P.Q. 48, at *3 (T.T.A.B. July 30, 1968)).[9]  The lawful use

requirement is applicable to senior user claims.  See id. at 634.  It is also applicable to a

claim for cancellation of a registered mark.  See GoClear LLC v. Target Corp., No. C 08-

2134 MMC, 2009 WL 160624, at *3 (N.D. Cal. Jan. 22, 2009).

KHB asserts that the KBI and Indica products bearing the KIVA mark were "all

infused with cannabis."  KHB MPI at 13 (quoting Amended Counterclaim ¶ 5).  And it

asserts that, whatever its status under state law, "marijuana remains illegal for all purposes

under federal law."  See id. (citing Trademark Laundering, Useless Patents, and Other IP

Challenges for the Marijuana Industry, 73 Wash. & Lee L. Rev. 217, 219 (Winter, 2016);

Trademark Manual of Examining Procedure § 907 (2018) ("Use of a mark in commerce

must be lawful use to be the basis for federal registration of the mark. . . . [the Controlled

Substances Act] makes it unlawful to manufacture, distribute, or dispense a controlled

substance [or] possess a Schedule I controlled substance. . . . regardless of state law,

marijuana [and] marijuana extracts . . . remain Schedule I controlled substances under

federal law and are subject to the CSA's prohibitions"); 21 U.S.C. § 812(c)(10) (listing

"[m]arihuana" in Schedule I)).

KHB is correct.  See, e.g., Trademark Laundering, 73 Wash. & Lee L. Rev. at 245–

46 ("The illegality doctrine thus poses great, possibly insurmountable, problems for the

marijuana industry.  So long as marijuana remains illegal under federal law, marijuana

businesses cannot demonstrate that they are engaged in lawful commerce, and their

applications for trademarks are now routinely denied. . . .").  In re Morgan Brown, 119

U.S.P.Q. 2d at *2–3, involved an attempt to register the mark "HERBAL ACCESS" for

"retail store services featuring herbs" where the store's services included the provision of

marijuana, "an illegal substance . . . in violation of the [CSA]."  The Trademark Trial and

Appeal Board explained that "[r]egardless of individual state laws that may provide for

---

[9] The Ninth Circuit later clarified that "trademark protection might not be withheld on account of
unlawful conduct that is 'collateral,' namely where there is an insufficient nexus between the
unlawful behavior and the use of the mark in commerce."  S. Cal. Darts Ass'n, 762 F.3d at 931
(quoting CreAgri, 474 F.3d at 631–32).  Collateral illegality is not an issue here.

legal activities involving marijuana, marijuana . . . remain[s a] Schedule I controlled substance[] under federal law[.]" Id. at *3. Because a store selling a good that is illegal under federal law is "a use that is unlawful," the Board affirmed the refusal to register the mark. Id. at *5. In a similar case, the Board also affirmed the refusal to register the marks "POWERED BY JUJU" and "JUJU JOINTS" for smokeless marijuana or cannabis vaporizing apparatuses, "based upon lack of lawful use of the mark in commerce[.]" In re JJ206, LLC, DBA Juju Joints, 120 U.S.P.Q. 2d 1568, at *1 (T.T.A.B. Oct. 27, 2016). The Board explained that "where the identified goods are illegal under the federal [CSA], the applicant cannot use its mark in lawful commerce[.]" Id. at *2. It reiterated that even if the goods are lawful under state law, that is "irrelevant to the question of federal registration when it is unlawful under federal law." Id. at *3 (quoting In re Morgan Brown, 119 U.S.P.Q. 2d 1350, at *1). Though the applicant argued that a series of policy ills would follow the refusal to grant trademark protection to marijuana-related goods and services, including that such businesses would suffer infringement, the Board responded that it "cannot simply disregard the requirement of lawful use[.]" Id. at *4.

KBI concedes, as it must, that marijuana is illegal under federal law. See KHB Reply re MPI at 6. It responds, though, that the illegality of its products under federal law "would be relevant if KBI were seeking federal trademark registration of the KIVA mark for use on its products," but is irrelevant to KBI's having invoked its "common law rights under California law." KBI Opp'n to KHB MPI at 22; see also KBI MPI at 8. KBI contends that KHB's trademark does not trump the valid rights KBI acquired under state law. KBI MPI at 7 (citing Stone Creek, Inc. v. Omnia Italian Design, Inc., 875 F.3d 426, 436 (9th Cir. 2017) ("the geographic scope of . . . rights in a registered trademark [under 15 U.S.C. § 1057] looks like Swiss cheese: it stretches throughout the United States with holes cut out where others acquired common-law rights prior to the registration.")).

In Stone Creek, 875 F.3d at 436, a defendant asserted that its use of the plaintiff's trademark was protected under the Tea Rose-Rectanus doctrine, which provides that "common-law trademark rights extend only to the territory where a mark is known and

recognized, so a later user may sometimes acquire rights in pockets geographically remote from the first user's territory." The court explained that a defendant's "common-law rights, if they exist, are not wiped out merely because [the plaintiff] later filed a federal registration. Although federal registration presumptively entitles the senior user to nationwide protection, 15 U.S.C. § 1057(b), the Lanham Act preserves legal and equitable defenses that could have been asserted prior to registration, id. § 1115(a)." [10] Id. Here, no one claims that the Tea Rose-Rectanus doctrine applies. Nor does it seem that KBI's use of the KIVA mark on a product that is illegal under federal law is a "legal and equitable defense[] that could have been asserted prior to [KHB's federal trademark] registration." See id.; see also In re JJ206, LLC, DBA Juju Joints, 120 U.S.P.Q. 1568, at *3 (that a good is lawful under state law is "irrelevant to the question of federal registration when it is unlawful under federal law.") (quoting In re Morgan Brown, 119 U.S.P.Q. 1350, at *1). KBI's earlier use of the mark on an illegal product would have carried no sway with the USPTO. See Trademark Laundering, 73 Wash. & Lee L. Rev. at 245–46.

KBI also relies on Headspace Int'l LLC v. Podworks Corp., 428 P.3d 1260, 1264 (Wash. Ct. App. 2018), as "recognizing a cannabis business'[s] state trademark rights within Washington state because cannabis activity is lawful there." KBI MPI at 8. But Headspace dealt only with Washington state law. See 428 P.3d at 1262. The court recognized by way of analogy that the Lanham Act requires a lawful use in commerce, and it cited to the Ninth Circuit's opinion in CreAgri. Id. at 1263–64. It held that because the California-based plaintiff had alleged the lawful use of its mark in Washington (i.e., a use that did not necessarily violate Washington's Uniform Controlled Substances Act), the trial court should not have dismissed the plaintiff's claims against a competing Washington-based marijuana business. Id. at 1262. Headspace did not involve a company with a federal trademark bringing a claim of federal trademark infringement against a state-legal

---

[10] 15 U.S.C. § 1115(a) states in part that a registration "shall not preclude another person from proving any legal or equitable defense or defect . . . which might have been asserted if such mark had not been registered."

marijuana company.

While KBI is only asserting California common law rights to the KIVA mark, see KBI MPI at 7, it is doing so as a defense to a federal trademark claim, see Compl. ¶¶ 24–33 (trademark infringement claim); KHB MPI at 6 (asserting likelihood of success on trademark infringement claim).  That defense relies on KBI's prior use of the mark.  See Sengoku Works, 96 F.3d at 1219 ("To acquire ownership of a trademark . . . the party claiming ownership must have been the first to actually use the mark in the sale of goods or services."); CreAgri, 474 F.3d at 630 ("only lawful use in commerce can give rise to trademark priority").  KBI's prior use was illegal under federal law.  See Palmer Decl. ¶ 4 (all KBI products contain cannabis); In re Morgan Brown, 119 U.S.P.Q. 2d at *3 ("Regardless of individual state laws that may provide for legal activities involving marijuana, marijuana . . . remain[s a] Schedule I controlled substance[] under federal law . . . .").  KBI therefore did not make lawful prior use of the mark.  See S. Cal. Darts Ass'n, 762 F.3d at 931.  To hold that KBI's prior use of the KIVA mark on a product that is illegal under federal law is a legitimate defense to KHB's federal trademark would "put the government in the anomalous position of extending the benefits of trademark protection to a seller based upon actions the seller took in violation of that government's own laws." See CreAgri, 474 F.3d at 630 (internal quotation marks omitted).

Although the parties have not identified, and the Court has not seen, any directly relevant authority about the interplay of state marijuana laws and federal trademark law,[11]

---

[11]     Two further cases merit discussion.

KBI argues that in Lochirco Fruit & Produce Co., Inc. v. Tarukino Holdings, Inc., No. C18-763-RAJ, 2019 WL 157939 (W.D. Wash. Jan. 9, 2019), "a court recognized trademark rights associated with state-legal cannabis goods without any consideration as to the federal illegality of the products." KBI Reply (dkt. 45-1) at 4.  It is true that the district court in the case did not address—one way or another—the issue of the defendant's federally-illegal marijuana-laced apple beverage on the plaintiff (a caramel apple company)'s federal and state trademark claims.  See generally Lochirco Fruit & Produce Co., 2019 WL 157939.  It is not clear from the opinion whether the parties raised the issue of illegal prior use in commerce.  See generally id.  However, the court there decided that the defendant company did not infringe on plaintiff's Happy Apple trademark because there was no likelihood of confusion between the two products.  See id. at *3. It did not need to reach the issue of first use.

KBI also alerted the Court to Woodstock Ventures LC v. Woodstock Roots, LLC, 387 F. Supp. 3d 306 (S.D.N.Y. 2019).  See Statement of Recent Decisions (dkt. 50, Ex. A).  In that case,

16

the Court is persuaded that the illegality of KBI's products under federal law renders KBI unable to challenge KHB's federal trademark. Accordingly, as of this stage in the case, KHB has demonstrated ownership of the mark nationally, including in California.

Even assuming that KHB prevails on this prong of the likelihood of success requirement, however, it has not demonstrated a likelihood of confusion.

### b.    Likelihood of Confusion

Likelihood of confusion exists "when consumers are likely to assume that a product or service is associated with a source other than its actual source because of similarities between the two sources' marks or marketing techniques." Int'l Jensen, Inc. v. Metrosound U.S.A., Inc., 4 F.3d 819, 825 (9th Cir. 1993) (internal quotation marks omitted). Courts in the Ninth Circuit analyzing likelihood of confusion look to the eight factors identified in AMF Inc. v. Sleekcraft Boats, 599 F.2d 341, 348–49 (9th Cir. 1979), abrogated on other grounds by Mattel, Inc. v. Walking Mountain Prods., 353 F.3d 792 (9th Cir. 2003): (i) the strength of the mark; (ii) the similarity of the marks; (iii) the proximity of the goods sold; (iv) the similarity in the marketing channels used; (v) the type of goods/services and the degree of care likely to be exercised by purchasers; (vi) the evidence of actual confusion; (vii) defendant's intent in selecting its mark; and (viii) the likelihood of expansion into other markets. These factors are mixed in this case.

### i.    Strength of the Mark

"The stronger a mark—meaning the more likely it is to be remembered and

---

the defendants, who owned a trademark of the WOODSTOCK mark for smokers' articles and related goods, sought a preliminary injunction against the plaintiff, producer of the 1969 Woodstock music festival, which used the WOODSTOCK mark on a variety of products, including "WOODSTOCK-branded recreational marijuana." See Woodstock Ventures, 387 F. Supp. 3d at 310–13. But in that case, too, the court decided that it "need not resolve the issue of . . . priority rights in the WOODSTOCK mark," because the defendants had failed to show a likelihood of confusion. Id. at 315. When the defendants argued that they intended to expand into the area of selling recreational marijuana, the court cited CreAgri and explained that it could not give any weight to such intent "because the sale of recreational marijuana is illegal under federal law." Id. at 318–19.

Accordingly, neither case (nor the Eastern District of Arkansas case also included in KBI's Statement of Recent Decisions) offers useful guidance on this issue.

associated in the public mind with the mark's owner—the greater the protection it is accorded by the trademark laws." Brookfield Commc'ns., Inc. v. W. Coast Entm't Corp., 174 F.3d 1036, 1058 (9th Cir. 1999). Strong marks are inherently distinctive and are "afforded the widest ambit of protection," whereas a "descriptive mark tells something about the product . . . [and] will be protected only when secondary meaning is shown." Sleekcraft, 599 F.2d at 349. KHB argues in conclusory fashion that its mark is "'strong,' and is not descriptive or generic." KHB MPI at 10. The Court agrees that the mark is not descriptive: the word Kiva does not describe anything about the KHB's health foods. See Lahoti v. Vericheck, 586 F.3d 1190, 1198 (9th Cir. 2009) ("'primary criterion' for distinguishing between a suggestive and a descriptive mark 'is the imaginativeness involved in the suggestion, that is, how immediate and direct is the thought process from the mark to the particular product.'") (quoting Self-Realization Fellowship Church v. Ananda Church of Self-Realization, 59 F.3d 902, 911 (9th Cir. 1995)). Moreover, "[f]ederal trademark registration alone may be sufficient . . . to satisfy . . . distinctiveness." Network Automation, 638 F.3d at 1149 (internal quotation marks omitted).

KBI argues that "[w]hile the KIVA mark may have some conceptual strength, it is commercially weak in the context of KHB's products." KBI Opp'n to KHB MPI (dkt. 24) at 10. Indeed, the other relevant measurement for the strength of the mark is its commercial strength. Network Automation, 638 F.3d at 1149. "Commercial strength is based on 'actual marketplace recognition,' and thus 'advertising expenditures can transform a suggestive mark into a strong mark.'" Id. (citing Brookfield, 174 F.3d at 1058). There is little in the record on this point—just that KHB's products have been commercially available since February 2013, Henderson Decl. ¶¶ 7, 8, and that KHB spent $245,000 in 2016, $720,000 in 2017, and $1,360,000 in 2018 to promote its KIVA-branded products, id. ¶ 10.[12] This evidence is insufficient to gauge the KHB mark's

---

[12] The Court is unpersuaded by KBI's argument that other companies using the name Kiva for other kinds of products undermines KHB's commercial strength. See KBI Opp'n to KHB MPI at 10, Schuman Decl. (dkt. 24-3) Ex. 4. None of the companies cited appear to operate in the same space as KHB. Id.

18

commercial strength, especially as it might compare to the KBI mark's commercial strength, see, e.g. Palmer Decl. ¶ 18 (millions of units sold since December 2010, including 1,705,000 units in California in 2018, marketing budget of $6.5 million for the year 2019); id. ¶ 5 (KBI's consumer and industry awards).

Given the current state of the record, the mark is conceptually strong, though perhaps not as commercially strong. This factor weighs in favor of confusion.

### ii. Similarity of the Marks

"Similarity of the marks is tested on three levels: sight, sound, and meaning," and "[e]ach must be considered as they are encountered in the marketplace." Sleekcraft, 599 F.2d at 351. KHB argues that "the marks are identical." KHB MPI at 8. It notes that the mark it registered is simply the four-letter name KIVA, and "consists of standard characters without claim to any particular font, style, size, or color." Henderson Decl. Ex. A (trademark No. 4,514, 257). But the sight of the marks as encountered in the marketplace are slightly different: KHB's website and its products display the word KIVA in all-capital, sans-serif, black letters, with two slim, green leaves (one dark, one light) in the shape of a V in place of the letter V. See www.kivahealthfood.com (last visited 8/19/2019). It looks like this:



The KBI website and products display the word KIVA in all-capital, sans-serif, bolded black letters with a shadow behind them. See, e.g., Henderson Decl. Ex. D (KBI vanilla chai milk chocolate sample). It looks like this:

**KIVA**

KBI notes that its mark is further distinguishable because it must clearly label its products as containing cannabis, stating "CANNABIS INFUSED" and bearing a symbol with a marijuana leaf and the letters CA. KBI Opp'n to KHB MPI at 13. So the packaging of the two companies also varies. The sound of the two marks is of course the same, as is the

meaning, because both have fanciful meanings. The marks are therefore similar but not identical. This factor also weighs in favor of confusion.

### iii.    Proximity of the Goods Sold

"For related goods, the danger presented is that the public will mistakenly assume there is an association between the producers of the related goods, though no such association exists." Sleekcraft, 599 F.2d at 350. "Related goods are those 'products which would be reasonably thought by the buying public to come from the same source if sold under the same mark.'" Id. at 348 n.10 (quoting Standard Brands, Inc. v. Smidler, 151 F.2d 34, 37 (2d Cir. 1945)). KHB argues that "the proximity of the goods is established [because] they are in the same USPTO goods classification." KHB MPI at 8–9. KHB's trademark is in Classification No. 30, for candy, chocolate powder, honey, syrups, natural sweeteners, and sweets. Id. at 9; see also Miller Decl. ¶ 5, Ex. J (Trademark ID Manual). But as KBI explains, "[t]he PTO's classifications exist solely for administrative purposes, and do[] not affect the substantive rights of a mark's owner in any way." See KBI Opp'n to KHB MPI at 10–11 (quoting Patsy's Italian Rest., Inc. v. Banas, 658 F.3d 254, 269 (2d Cir. 2011); Nat'l Football League v. Jasper All. Corp., 16 U.S.P.Q.2d 1212, at *4 n.5 (T.T.A.B. 1990) ("Applicant is also mistaken in its belief that the classification system within the [PTO] has some bearing on the question of likelihood of confusion. This is simply not so.")).

"To determine whether goods are related, courts may consider whether the goods are complementary, whether the products are sold to the same class of purchasers, and whether the goods are similar in use and function." Groupion, LLC v. Groupon, Inc., 859 F. Supp. 2d 1067, 1074 (N.D. Cal. 2012). At a high enough level of abstraction, the goods are related: they are both food items, sold to people looking for food. But upon any closer examination, they are quite different. One is candy combined with a recreational drug, the other is health food. While KHB's products are used for nutrition, see KHB MPI at 1 ("eco-friendly, unadulterated health food products"), KBI's products are used to ingest

cannabis, <u>see id.</u> at 4, Palmer Decl. ¶ 4.  Unlike wine and cheese, or salami and cheese, there is no evidence that KBI's cannabis-infused confections (like a cannabis-infused espresso dark chocolate bar), and either KHB's health supplements (like berry powder) or its pantry items (like Spanish saffron) are complementary.  <u>See E. & J. Gallo Winery v. Gallo Cattle Co.</u>, 967 F.2d 1280, 1291 (9th Cir. 1992).  And KHB has submitted no evidence that the companies serve the same customers.  In fact, KHB's products are available on the internet, while KBI's products are only available to adults over 21 years old and/or approved medical marijuana users, and then only through state-licensed dispensaries and delivery services.  <u>See</u> Henderson Decl. ¶ 8, KBI Opp'n to KHB MPI at 11 (citing. e.g., Cal. Bus. & Prof. Code §§ 26140(a)(1) and (c)(1)).

This factors weighs heavily against confusion.

### iv.     Similarity in the Marketing Channels Used

"Convergent marketing channels increase the likelihood of confusion."  <u>Sleekcraft</u>, 599 F.2d at 353.  KHB argues only that the two companies "have promoted and marketed their products over the internet."  KHB MPI at 9.  But this argument also fails.  "[T]he shared use of the internet as a marketing channel is ubiquitous and, thus, does not shed much light on the likelihood of consumer confusion."  <u>Groupion</u>, 859 F. Supp. 2d at 1077; <u>see also</u> <u>Network Automation</u>, 638 F.3d at 1151 ("Today, it would be the rare commercial retailer that did not advertise online, and the shared use of a ubiquitous marketing channel does not shed much light on the likelihood of consumer confusion.").  Moreover, though there is no evidence on this point in the record, it seems likely that the two companies advertise in different places outside of the internet.  KHB has failed to demonstrate that this factor weighs in favor of confusion.

### v.     Type of Goods and Degree of Care Likely to be Exercised by Purchasers

"In assessing the likelihood of confusion to the public, the standard used by the courts is the typical buyer exercising ordinary caution."  <u>Sleekcraft</u>, 599 F.2d at 353.

United States District Court
Northern District of California

"When the buyer has expertise in the field, a higher standard is proper though it will not preclude a finding that confusion is likely." Id. "Similarly, when the goods are expensive, the buyer can be expected to exercise greater care in his purchases; again, though, confusion may still be likely." Id. KHB does not address this point, and there is little evidence in the record to assist the Court with it. The products at issue are relatively inexpensive, which would suggest that purchasers would not exercise a high degree of care. See id. However, KBI cites to a few cases suggesting that purchasers might exercise a higher degree of care when ingesting something for health purposes. See KBI Opp'n to KHB MPI at 14 (citing, e.g., Reeves v. Gen. Nutrition Ctrs., Inc., No. SA CV 10-01653 JAK (FFMx), 2012 WL 13018362, at *7 (C.D. Cal. Apr. 2, 2012) ("The relevant consumers are either looking for a diet plan or shopping for a protein drink, and in both scenarios, the consumers are seeking to reach their health goals through the use of these products, which leads to a higher level of care."). That point applies less well to KHB's honey and cinnamon than it does to its health food supplements.[13] Accordingly, this factor just slightly weighs in favor of confusion.

### vi.    Evidence of Actual Confusion

"Evidence that use of the two marks has already led to confusion is persuasive proof that future confusion is likely," but "[p]roving actual confusion is difficult[.]" Sleekcraft, 599 F.2d at 352. KBI asserts that it "has not received any reports of actual confusion between its products and KHB's products." KBI Opp'n to KHB MPI at 15 (citing Palmer Decl. ¶¶ 22–23, Palmer Depo. at 74–76, 78–79).[14] KHB asserts, however, that beginning in late 2016 or early 2017 (and continuing through March 26, 2019, see KHB Opp'n to KBI MPI at 14), KHB "became aware of a substantial, and increasing, number of

---

[13] As to KBI's products, it stands to reason that consumers intending to ingest cannabis would exercise a higher degree of care in selecting their product, and that customers might study a product's label to determine how potent they wish their confection to be.

[14] KHB argues that KBI is aware of customer confusion, because KBI once received an email from an ingredients supplier on which KHB was mistakenly copied. See KHB Opp'n to KBI MPI at 16–17, Johnson Opp'n Decl. Ex. 12 (dkt. 28-1). But this email from a supplier does not speak to customer confusion.

complaints and questions indicating that consumers were confusing Kiva Health's KIVA brand with Kiva Confections." Henderson Decl. ¶ 13. KHB staff began making entries into a consumer confusion log. Id., Ex. E (log). The log purportedly reflects phone calls and emails received from consumers, Henderson Depo. at 110, and includes nine pages of lines like "April 2017 – questions regarding if we switch our company to medical THC now – John," see Henderson Decl. Ex. E at 1.

KBI asserts, persuasively, that the log does not satisfy the business records exception to the hearsay rule. KBI Opp'n to KHB MPI at 16. "Rule 803(6) requires that 'making the record was a regular practice of' the business," ADT Security Servs. v. Security One Int'l, Inc., No. 11-cv-5149 YGR, 2013 WL 4766401, at *2–3 (N.D. Cal. Sept. 5, 2013), which it was not here, see Henderson Depo. at 99. A log also indicates "a lack of trustworthiness" if it was created as a record for litigation, see ADT Security Servs., 2013 WL 4766401, at *2–3; Henderson Depo. at 88–89 (log started after consulting with current litigation counsel); but see Henderson Depo. at 145–46 (claiming to have independently had the idea of creating a consumer confusion log).

On the other hand, courts in this circuit generally hold that the testimony of a plaintiff's employees that consumers were confused is not hearsay at all, because it is not offered to prove the truth of the consumer's assertions, only that the callers made the assertions. See, e.g., Mustang Motels, Inc. v. Patel, 226 U.S.P.Q. 526, 1985 WL 72659, at *1 n.1 (C.D. Cal. Mar. 1, 1985); Sinhdarella, Inc. v. Vu, 85 U.S.P.Q. 2d 2007, 2008 WL 410246, at *4 (N.D. Cal. Feb. 12, 2008); Lahoti v. Vericheck, Inc., 636 F.3d 501, 509, 97 U.S.P.Q. 2d 1878 (9th Cir. 2011) (applying the state of mind exception); see also McCarthy § 23:15 ("In my view, it is clear that testimony from . . . employees or others about what customers have told them about their mistaken beliefs should not be excluded from evidence as 'hearsay'. . . . it is only being offered to prove . . . state of mind").

The Court agrees with the weight of the authority in this circuit that the log is not hearsay. See also Herb Reed Enters., LLC v. Fla. Ent. Mgmt., Inc., 736 F.3d 1239, 1250 n.5 (9th Cir. 2013) ("Due to the urgency of obtaining a preliminary injunction at a point

when there has been limited factual development, the rules of evidence do not apply strictly to preliminary injunction proceedings."). Nonetheless, the Court still views the log with some skepticism. As KBI has demonstrated, KHB did not record any of the phone calls reflected in the log, it deleted all of the voicemails, and it did not retain any of the underlying emails. Henderson Depo. at 111, 122–23; see also id. at 120 ("Q: And, to be clear, there's no other record that shows the last name. It's just first names on this list, but you don't have any other record that shows anybody's last name? A: Correct."). Nor did Henderson, the KHB 30(b)(6) witness, have an "independent recollection of any of the log entries." Id. at 126. Accordingly, the log is some evidence of actual confusion, but it is not entirely reliable. This factor therefore does not weigh as heavily in favor of confusion as KHB insists.

### vii. Defendant's Intent in Selecting its Mark

"When the alleged infringer knowingly adopts a mark similar to another's, reviewing courts presume that the defendant can accomplish his purpose: that is, that the public will be deceived." Sleekcraft, 599 F.2d at 354. There is no evidence here that KBI intentionally selected the KIVA mark to infringe on KHB; in fact, the evidence is that KBI chose the mark in 2010 in ignorance of KHB. See Palmer Decl. ¶¶ 7, 8, 21, Ex A. This factor does not weigh in favor of confusion.

### viii. Likelihood of Expansion into Other Markets

"Inasmuch as a trademark owner is afforded greater protection against competing goods, a 'strong possibility' that either party may expand his business to compete with the other will weigh in favor of finding that the present use is infringing." Sleekcraft, 599 F.2d at 254. "When goods are closely related, any expansion is likely to result in direct competition." Id. There is no evidence that KHB intends to expand its product line to become any more closely related to KBI's, or vice versa. The only threatened expansion is that KBI continues to expand its marketing of cannabis-infused goods to other states. See KHB MPI at 9. Because the goods are not closely related, however, KBI's expansion to

other states does not weigh heavily in favor of confusion.

All in all, although KHB's mark is at least conceptually strong, and the marks are similar, the differences in the goods sold and (likely) the marketing channels used mean that there is not a significant likelihood of confusion here. See Brookfield, 174 F.3d at 1054 ("Some factors are much more important than others, and the relative importance of each individual factor will be case-specific."). While there is some evidence of actual confusion, that evidence is not entirely reliable. The Court therefore concludes that KHB has failed to demonstrate a likelihood of confusion, and therefore also failed to demonstrate a likelihood of success on the merits (notwithstanding its probable ability to show ownership of the mark).

### 2. Irreparable Harm

The second requirement for injunctive relief is that the plaintiff is likely to suffer irreparable harm in the absence of preliminary relief. See Rodriguez, 715 F.3d at 1133. Irreparable harm is no longer presumed where there is a strong case of trademark infringement. See Herb Reed Enters., 736 F.3d at 1249. Loss of goodwill and the ability to control one's mark can amount to irreparable harm, but a plaintiff must point to actual evidence on these points. See id. at 1250 ("court's pronouncements [must be] grounded in . . . evidence. . . ."); see also SunEarth, Inc. v. Sun Earth Solar Power Co., Ltd., 846 F. Supp. 2d 1063, 1083 (N.D. Cal. 2012) ("Ninth Circuit has recognized that the potential loss of good will or the loss of the ability to control one's reputation may constitute irreparable harm or purposes of preliminary injunctive relief." (citation omitted)).

### a. Evidence of Harm

KHB argues that it has demonstrated the loss of "control over its business reputation" in light of "the evidence of consumer confusion." KHB MPI at 16. It adds that KBI's expansion to Hawaii and Michigan "and presumably beyond" further endangers KHB's brand. Id. But those are just references to the consumer confusion log and KBI's likelihood of expansion. Arguing that they demonstrate irreparable harm is akin to arguing

that a clear-cut case of trademark infringement leads to a presumption of irreparable harm. That is not the law. See Herb Reed Enters., 736 F.3d at 1249.

The only other evidence that KHB has identified that is relevant to irreparable harm is Henderson's declaration. Henderson declared that in his "opinion," KHB "is suffering economic damage and injury to its reputation and good will, and that this damage and injury will continue as long as [KBI] sells products with the KIVA mark." Henderson Decl. ¶ 15. A conclusory and self-serving declaration by the head of a plaintiff's company is, standing alone, weak evidence of irreparable harm. Compare VBS Distrib., Inc. v. Nutrivita Labs., Inc., No. SACV 16-01553-CJCDFMX, 2017 WL 2404919, at *5 (C.D. Cal. Jan. 19, 2017) (insufficient showing where plaintiff "offered only the self-serving declaration of its CEO"), rev'd on other grounds, 697 F. App'x 543 (9th Cir. 2017); with SolarEdge Techs. Inc. v. Enphase Energy, Inc., No. 17-CV-04047-YGR, 2017 WL 3453378, at *6 (N.D. Cal. Aug. 11, 2017) ("bare, threshold showing" of irreparable harm where plaintiff offered sworn statement of senior executive but no data to support her conclusions). Moreover, as KBI points out, the evidence in the record reflects that KHB's sales have nearly tripled in the time that KHB has been recording instances of customer confusion, increasing from 108,000 units in 2016 to 294,000 units in 2018. See KBI Opp'n to KHB MPI at 8 (citing Palmer Decl. ¶ 11).[15]

KHB's evidence of irreparable harm is therefore not substantial.

### b. Delay

A further, significant problem with KHB's claim of irreparable harm is that KHB waited as long as it did to seek a preliminary injunction. "[L]ong delay before seeking a preliminary injunction implies a lack of urgency and irreparable harm." Oakland Tribune, Inc. v. Chronicle Pub. Co., 762 F.2d 1374, 1377 (9th Cir. 1985). In Oakland Tribune, the Ninth Circuit held that "[w]here no new harm is imminent, and where no compelling

---

[15] KHB responds that it has experienced an increase in sales in spite of the customer confusion, and that its success is due to KHB's increase in advertising. KHB Reply re MPI at 2–3. This assertion might be correct, but it is unproven.

reason is apparent, the district court was not required to issue a preliminary injunction against a practice which has continued unchallenged for several years." Id. "[A]lthough a particular period of delay may not rise to the level of laches and thereby bar a permanent injunction, it may still indicate an absence of the kind of irreparable harm required to support a preliminary injunction." Ctr. for Food Safety v. Schafer, No. C 08-00484 JSW, 2010 WL 964017, at *4 (N.D. Cal. Mar. 16, 2010) (quoting Quince Orchard Valley Citizens Ass'n, Inc. v. Hodel, 872 F.2d 75, 80 (4th Cir. 1989)). The Ninth Circuit has explained that "delay is but a single factor to consider in evaluating irreparable injury" and that "courts are 'loath to withhold relief solely on that ground.'" Arc of Cal. v. Douglas, 757 F.3d 975, 990 (9th Cir. 2014) (quoting Lydo Enters., Inc. v. City of Las Vegas, 745 F.2d 1211, 1214 (9th Cir. 1984). In addition, where there are "ongoing, worsening injuries," delay is not terribly probative. Id.; see also Garcia v. Google, Inc., 766 F.3d 929, 938 (9th Cir. 2014), on reh'g en banc, 786 F.3d 733 (9th Cir. 2015) (plaintiff not dilatory in bringing suit where she "took legal action as soon as . . . she began receiving death threats—in other words, as soon as there was a 'need for speedy action.'").

KHB has known about KBI and its use of the KIVA mark since June 2015. Henderson Depo. at 65. June 2015 is also when KHB first consulted with litigation counsel about KBI. Schuman Decl. Ex. 1 at 7 (interrogatory response). But KHB did not send a cease and desist letter to KBI until May 2018, see Henderson Decl. Ex. F, it did not bring suit until September 2018, see generally Compl., and it did not file its motion for a preliminary injunction until March 2019, see generally KHB MPI.

KHB responds that it did not act unreasonably by not bringing suit in June of 2015, because Henderson believed at first that KBI was only selling its KIVA-branded products in San Francisco, and he believed that KBI's products initially used the name "Kiva Confections" rather than "Kiva." KHB MPI at 4–5 (citing Henderson Decl. ¶ 12); KHB Reply re MPI at 3. But asked for the basis of his belief that KBI only sold its products in San Francisco, Henderson responded "I don't know." Henderson Depo. at 68–69. KBI was in fact selling in all of California as of 2011. See Palmer Decl. ¶ 13, Ex. E. KBI also

submits that there has been no change in how often it uses the word "Confections" since June 2015. See Palmer Decl. ¶¶ 15, 18. And KBI asserts that a June 2015 search of its website would have shown the quotation "KIVA™ A Higher Chocolate Experience" on its landing page—without "Confections" following the word "KIVA"—and the exact same product packaging that Henderson now asserts reflects a change. See KBI Opp'n to KHB MPI at 7–8 (citing Palmer Decl. ¶ 16, Ex. F, id. ¶ 17, Ex. G).[16]

KHB next asserts that it began to receive complaints and questions from customers in late 2016 or early 2017, only then "had reason to re-investigate," and sent a cease and desist letter in May 2018. KHB Reply re MPI at 3; KHB Opp'n to KBI MPI at 5. It then exchanged correspondence with KBI until August 2018, and was, it suggests, lulled into inaction by KBI's counsel's mention of an "amicable resolution" and suggestion that mediation might be "premature." KHB Opp'n to KBI MPI at 6, Johnson Reply Decl. Exs. 1, 2. KHB argues that "Even a slow, steady 'progressive encroachment' by the defendant who edges closer and closer to plaintiff might excuse delay." KHB Opp'n to KBI MPI at 5 (citing McCarthy § 31:19). It also notes that "a delay in moving for a preliminary injunction can be excused by . . . settlement negotiations." Id. at 6 (quoting McCarthy § 31:32; Warner Bros. Entm't v. Glob. Asylum, Inc., 107 U.S.P.Q.2d 1910, 1927, 2012 WL 6951315, at *21 (C.D. Cal. Dec. 10, 2012) (four month delay applying for TRO excused by investigation and settlement negotiations)).

KHB's reasons for delaying between June 2015 (when it first learned of KBI and first consulted with counsel) and early 2017 (when it began collecting evidence of consumer confusion) are questionable given the available evidence about KBI's sales throughout California and about KBI's packaging. However, even assuming that KHB properly delayed taking action to protect its mark until early 2017, KHB then waited until May of 2018 to send a cease and desist letter. KHB nowhere explains this year and a half

---

[16] KBI apparently showed these pages to Henderson in his deposition and he did not recall seeing them, see Henderson Depo. at 83–85, but what matters is what KHB should have seen through a reasonable investigation, see Grupo Gigante Sa De CV, 391 F.3d at 1102.

delay. And even assuming that it was justifiable to delay between May 2018 (the cease and desist letter) and December 2018 (when, after bringing this suit in September 2018 and participating in a mediation, KHB served the complaint on KBI), it is also not clear why KHB waited from December 2018 to March 2019 to bring this motion.

Although the case law varies as to how much delay is permissible, KHB's delay here was certainly substantial. See, e.g., Polymer Techs., Inc. v. Bridwell, 103 F.3d 970, 976 (Fed. Cir. 1996) (four month delay between beginning of infringing activities and bringing of suit did not rebut presumption of irreparable harm); High Tech Med. Instrumentation, Inc. v. New Image Indus., Inc., 49 F.3d 1551, 1557 (Fed. Cir. 1995) ("Absent a good explanation . . . 17 months is a substantial period of delay that militates against the issuance of a preliminary injunction by demonstrating that there is no apparent urgency to the request for injunctive relief"); Alacritech, Inc. v. Microsoft Corp., No. 04-03284 JSW, 2005 WL 850729, at *7 (N.D. Cal. Apr. 12, 2005) (delay of a little over three months between filing lawsuit and filing motion for preliminary injunction does not rebut presumption of irreparable harm); First Franklin Fin. Corp. v. Franklin First Fin., Ltd., 356 F. Supp. 2d 1048, 1055 (N.D. Cal. 2005) (three month delay "undercuts . . . claims of urgency and irreparable harm"); Playboy Enters., Inc. v. Netscape Commc'ns Corp., 55 F. Supp. 2d 1070, 1090 (C.D. Cal. 1999) (five month delay "in seeking injunctive relief further demonstrates the lack of any irreparable harm").

Between the lack of evidence of damage to KHB's good will and to its ability to control its mark, and KHB's delay in pursuing this litigation, KHB has failed to demonstrate that it is facing a likelihood of irreparable harm warranting urgent injunctive relief.

### 3. Final Requirements

The third and fourth requirements for injunctive relief are that the balance of equities tips in the plaintiff's favor, and that an injunction is in the public interest. See Rodriguez, 715 F.3d at 1133.

### a.  Balance of Hardships

As to balance of hardships, KHB argues that if no injunction issues, it will continue to experience customer confusion and damage to its good will, but if an injunction issues, KBI "will only be inconvenienced by having to undertake the effort and expense to re-brand." KHB MPI at 16–17.  It notes that KBI has had actual notice of KHB since August 2017, and that rather than re-brand, it has denied wrongdoing and continued to expand.  Id. at 17.  And it argues that KBI brought "upon itself" any hardship that would come with an injunction.  Id. (citing McCarthy § 30:51).

This is not a case where an infringing defendant has intentionally usurped another's mark.  Rather, KBI and its predecessor company, Indica, have been using the KIVA mark since 2010, before KHB first used the mark on a food product in February 2013.  See Henderson Decl. ¶¶ 7, 8; Palmer Decl. ¶¶ 6, 8.  Though KBI continued to grow its business and use the KIVA mark over the years, even after receiving a cease-and-desist letter from KHB in May 2018, it had a nonfrivolous legal defense to KHB's infringement claim in a novel area of the law.  So KHB's argument that KBI brought any hardship onto itself is not particularly compelling.

Moreover, KBI asserts that it spent "almost eight years on product development, sales, brand recognition, and geographic expansion before KHB filed this lawsuit."  KBI Opp'n to KHB MPI at 20; see also McCarthy § 30:51 ("when a plaintiff delays in filing suit in a case closely balanced on the merits, a preliminary injunction may be denied on the basis that the harm to the defendant increases with the passage of time.").  KBI also submits that the cost for it to rebrand would exceed $3 million.  See KBI Opp'n to KHB MPI at 20 (citing Grablick Decl. (dkt. 24-2) ¶¶ 6–8).  The hardship to KBI in granting an injunction and forcing it to undergo a massive rebranding of a name it has built up for about nine years would therefore be much greater than the hardship to KHB in denying an injunction and thereby maintaining the status quo.

### b.    Public Interest

As to public interest, "[p]reventing consumer confusion serves the public interest." Stark v. Diageo Chateau & Estate Wines Co., 907 F. Supp. 2d 1042, 1067 (N.D. Cal. 2012).  There is some risk of confusion here—and the customer confusion log is some evidence of existing confusion—but, as discussed above, the Court is not persuaded that the risk is significant.  KHB's additional claim to the public interest, that an injunction would "protect[] the public from purchasing and using marijuana infused food products, when they intend to purchase and use GMO free, pure, healthy food products sourced from eco-friendly farmers," is nonsensical, and actually underscores the differences in the products.  See KHB MPI at 18.  KBI's products are only available at licensed dispensaries and mobile delivery services; there is no evidence that any reseller sells both KHB and KBI products.  See KBI Opp'n to KHB MPI at 20–21 (citing Henderson Depo. at 14–15; Cal. Bus. & Prof. Code § 26140(a)(1) and (c)(1), 16 C.C.R. § 5407).  It is hard to imagine a customer wanting to order some Omega 3 Fish Oil from KHB and ending up with—and mistakenly ingesting—a cannabis-infused confection by mistake.  The public interest factor therefore favors KHB, though not as strongly as it suggests.

In conclusion then, because KHB has not demonstrated that it is likely to succeed on the merits, because KHB has failed to demonstrate irreparable harm, and because while the public interest favors KHB, the balance of the hardships does not, the Court DENIES KHB's MPI.

### B.    KHB's Motion to Dismiss Two Counterclaims

KHB next moves to dismiss KBI's two federal counterclaims, specifically the second counterclaim, which argues that KHB's registered trademarks should be cancelled, and the third counterclaim, which argues that KHB infringed KBI's marks under the Lanham Act.  See KHB MTD at 18–19; Amended Counterclaims at ¶¶ 45–56 (Second Cause of Action: Petition to Cancel the KHB Marks), ¶¶ 57–65 (Third Cause of Action:

Infringement of Unregistered Marks and Federal Unfair Competition).[17] KHB argues that both claims require KBI to demonstrate that it acquired a right to the KIVA mark through lawful first use in commerce, but because KBI used the mark for marijuana-based products, KBI's use was not lawful. See KHB MTD at 20–22. KBI responds that KHB's argument "would be relevant if KBI were seeking federal trademark registration" but is not relevant to KBI's having "invoked its common law rights under California state law." KBI Opp'n to KHB MTD at 22.

As discussed above, the Court disagrees with KBI's position. Both of KBI's counterclaims depend upon KBI being the senior user of the mark under federal law. See id. at 23 ("KBI has also established that it is the senior user of the KIVA mark") and id. at 24 (citing requirement that plaintiff be "senior user of the mark"). Because KBI's products are illegal under federal law, KBI cannot demonstrate that it made lawful use of the mark in commerce prior to KHB. See CreAgri, 474 F.3d at 634 (lawful use requirement is applicable to senior user claims); GoClear, 2009 WL 160624, at *3 (lawful use requirement is applicable to claim for cancellation of a registered mark); In re JJ206, LLC, DBA Juju Joints, 120 U.S.P.Q. 1568, at *2 ("where the identified goods are illegal under the federal [CSA], the applicant cannot use its mark in lawful commerce").

Accordingly, the Court GRANTS KHB's MTD and DISMISSES KBI's second and third counterclaims.

## C.     KBI's Cross-Motion for Preliminary Injunction

Finally, KBI has filed a cross-motion for a preliminary injunction based on its California counterclaims. See KBI MPI at 1, 2, 7. KBI argues that "if the Court grants KHB's request for a preliminary injunction, over KBI's opposition, then it also should grant KBI's cross-motion for a preliminary injunction enjoining KHB from using the

---

[17] The remaining counterclaims are for declaratory judgment, trademark infringement under California statutory law, unfair competition under California statutory law, and trademark infringement and unfair competition under California common law. See generally Amended Counterclaim. The Court does not address those counterclaims now.

KIVA mark in California." See id. at 9. The Court is denying KHB's MPI, so, with that prerequisite unmet, the Court also DENIES KBI's motion. Even standing on its own, however, KBI's motion is unavailing. Although the motion cites the Winter factors, see id. at 1, its discussion of those factors is wanting.

### 1. Irreparable Harm

KBI's discussion of irreparable harm is all of one paragraph, and it is titled, "If KHB Has Established A Likelihood of Irreparable Harm, So Has KBI." Id. at 2. KBI argues only that it has delayed for less time than KHB delayed. Id. It offers no evidence of, or even argument about, injury, such as damage to its brand or to its ability to control its mark. Contra Herb Reed Enters., 736 F.3d at 1249. This is an inadequate showing.

### 2. Likelihood of Success

KBI's showing as to likelihood of success on the merits is also inadequate. KBI correctly identifies the two necessary components to a claim of trademark infringement in California—ownership of the mark and likelihood of confusion. See KBI MPI at 2. But it makes no arguments at all as to likelihood of confusion, arguing only that "if the Court finds that likelihood of confusion exists, then KBI is likely to succeed on its California trademark infringement claims against KHB." Id. It does so despite having argued that the KHB customer confusion log is untrustworthy and improper, see KBI Opp'n to KHB MPI at 15–18, and that it is unaware of any confusion caused by the parties' concurrent use of the KIVA mark, see Johnson Opp'n Decl. Ex. 8 (KBI Resp. to Interrogs. no. 7). In any case, this Order concludes that KHB did not make a convincing case for likelihood of confusion. KBI has therefore also failed to demonstrate likelihood of confusion,[18] and accordingly has failed to demonstrate likelihood of success on the merits.

---

[18] Given KBI's failure to demonstrate likelihood of confusion, the Court does not reach KBI's arguments as to the second component of a California infringement claim, a protectable ownership interest. See KBI MPI at 3–8.

### 3. Final Requirements

If a party fails to demonstrate irreparable harm or a likelihood of success on the merits, a court need not consider the other factors. See <u>Jumbo Bright Trading Ltd. v. Gap, Inc.</u>, No. CV 12-08932 DDP (MANx), 2012 WL 5289784, at *1 (C.D. Cal. Oct. 25, 2012). The Court does not reach the balance of the hardships or the public interest factors.

In conclusion, because KBI's motion was contingent upon the Court's granting of KHB's motion, and because KBI has failed to demonstrate irreparable harm or a likelihood of success on the merits, the Court DENIES KBI's MPI.

## IV. CONCLUSION

For the foregoing reasons, the Court DENIES both parties' motions for preliminary injunction, and GRANTS KHB's motion to dismiss the two KBI counterclaims that are based on federal law.

**IT IS SO ORDERED.**

Dated: September 6, 2019

CHARLES R. BREYER
United States District Judge