IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KIVA HEALTH BRANDS LLC,<br>Plaintiff,<br>v.<br>KIVA BRANDS INC., et al.,<br>Defendants. | Case No. 19-cv-03459-CRB<br><br>**ORDER ON CROSS-MOTIONS** |

In this trademark case, Plaintiff Kiva Health Brands LLC ("KHB"), a maker of natural foods, and Defendant Kiva Brands Inc. ("KBI"), a maker of cannabis-infused chocolates, both claim the right to the KIVA mark. The Court instructed the parties to file "any motions for summary judgment or partial summary judgment, as to the federal claims in this case only." Order Vacating CMC (dkt. 61). In response, KHB filed a motion for partial summary judgment on KBI's affirmative defenses of laches, prior use, acquiescence, waiver, and estoppel. KHB MSJ (dkt. 63). The same day, KBI filed a motion for partial summary judgment on the single affirmative defense of laches. KBI MSJ (dkt. 64). Because there is a dispute of fact as to when KHB knew or should have known about the threat from KBI, the Court DENIES both motions as to laches. Because KHB prevails on the prior use affirmative defense, the Court GRANTS its motion on that ground. Because there has not yet been discovery on the issues of acquiescence, waiver and estoppel, the Court DENIES KHB's motion on those grounds.

# I. BACKGROUND

## A. Plaintiff Kiva Health Brands ("KHB")

Plaintiff KHB is a Nevada corporation, with a principal place of business in Hawaii. Henderson Decl. (dkt. 63-1) ¶ 3. It sells health and wellness products throughout the United States and internationally. Id. ¶ 2. Tchad Henderson, a managing member of KHB, along his wife, Janet Chong-Henderson, chose the name KIVA in May or June of 2009 after a trip to Arizona: it refers to a Pueblo word for underground rooms that the Hopi and other Puebloan people used for religious ceremonies. Id. ¶ 4. When starting the business in 2009, Mr. Henderson conducted internet searches to see if other companies used the name KIVA. Id. In 2009, he registered the domain name kivahealthbrands.com. Id. KHB developed its KIVA logo in March 2010 for use on its KIVA Maqui Berry Powder. Id. ¶ 5. In 2010, in connection with the incorporation process, Mr. Henderson conducted another round of searches for other companies using KIVA, and found none that sold health or food products. Id. ¶ 6. KHB began selling its KIVA Maqui Berry Powder to the public in February 2013. Id. ¶ 7. KHB's first online sales were via Amazon.com in June 2013; in September 2013, KHB also sold products through its website, www.kivahealthfood.com. Id. ¶ 9.

In September 2013, KHB filed an application with the USPTO to register the KIVA mark in connection with food products. Id. ¶ 10. Before that, Mr. Henderson "again conducted searches for companies that used 'KIVA' in connection with their provision of goods and services," and he "did not turn up any companies that used 'KIVA' to market health products or food products such as those that [KHB] sells." Id. ¶ 12. USPTO issued KHB a registration on April 15, 2014. Id. ¶ 10. In 2015 and 2016, KHB obtained additional trademark registrations for marks with the word KIVA on additional food and cosmetic products. Id. ¶ 11.

## B. Defendant Kiva Brands Inc. ("KBI")

Defendant KBI is an Oakland-based company incorporated in Delaware. First

2

Amended Counterclaim ("FACC") (dkt. 10) ¶ 1. It is a leading provider of cannabis-infused edible chocolates and confections. Palmer MPI Decl. (dkt. 24-1) ¶ 4. Scott Palmer, the CEO and co-founder of KBI, asserts that KBI started in November 2010 as a California not-for-profit mutual benefit corporation (CNMBC) named Indica. Id. ¶¶ 6, 8.[1] Mr. Palmer and his wife, Kristi Knoblich, brainstormed potential trade names for the company, and decided to do business as "Kiva Confections." Id., Ex. A.

Mr. Palmer declares that Indica manufactured, sold and distributed products bearing the names KIVA and/or KIVA CONFECTIONS with permission from Mr. Palmer and Ms. Knoblich. Id. ¶ 9. The contract that purports to govern that arrangement is the TM License Agreement, between Mr. Palmer and Ms. Knoblich, Licensors, on the one hand, and Indica, Licensee, on the other. See Palmer MPI Decl. Ex. B. The "TM License Agreement was signed on or around October 2018, but [purportedly] memorialized the agreement that had existed since November 2010." Palmer MPI Decl. ¶ 9, Ex. B.[2] The Court has previously stated that irregularities with the TM License Agreement made the Court disinclined to accept it "as proof of a 2010 assignment of the KIVA mark from Palmer and Knoblich to Indica." Order re MPIs (dkt. 52) at 8–11.

There was a Kiva Confections website as early as March 2011. See Palmer MSJ Decl. (dkt. 67-2) ¶ 6, Ex. A (single page with "KIVA Cannabis Confections," describing Kiva chocolates as "a chocolate bar that redefines what a cannabis confection ought to be," and listing under "where to find us" locations in Berkeley and San Jose, with Oakland and San Francisco "coming soon"); see also id. Ex. B (essentially the same page from March 2012); id. Ex. C (essentially the same page from March 2013, with "please contact us for a list of supporting collectives in your area" instead of a locations list). Kiva Confections had a publicly-available Facebook page since December 2010. See id. ¶ 12; id. Ex. G

---

[1] The legal relationship between Indica and KBI is a matter of great dispute and impacts the defense of prior use, as discussed below.

[2] Mr. Palmer testified in his deposition that it appeared that the license agreement was signed in November 2010. See Miller Decl. (dkt. 21-4) ¶ 8. In subsequent correspondence, Mr. Palmer corrected that testimony to say that it was signed around October 2018 effective November 23, 2010. Id., Ex. L

3

(Facebook page from December 2010, showing photo of KIVA "Medical Cannabis Chocolate Bar[s]"); id. Ex. H (Facebook page from February 2011, showing three people in KIVA t-shirts at a KIVA booth, advertising KIVA bars); id. Ex. I (Facebook page from May 8, 2012, showing KIVA "medical cannabis" bars, introducing "Blackberry Dark Chocolate" flavor, along with the message, "When you plan a trip to Cali, we'll be here waiting for you!").

Mr. Palmer and Ms. Knoblich formed KBI in 2014. Palmer MPI Decl. ¶ 10. Mr. Palmer asserts that "[b]etween approximately 2014 through 2017, Indica and related entities were reorganized into KBI and its wholly-owned subsidiaries." Id.[3] Mr. Palmer and Ms. Knoblich agreed to transfer all of the intellectual property to KBI in October of 2014. Palmer MPI Decl. ¶ 11, Ex. C ("IP Sale Agreement"). That agreement, between KBI, Buyer, and Mr. Palmer and Ms. Knoblich, Sellers, listed the California trademark for KIVA and the trademark application for KIVA among the intellectual property being sold. Id. Schedule A. Mr. Palmer and Ms. Knoblich co-founded KBI, Indica, and all of their affiliates. Palmer MPI Decl. ¶ 12. They have been the majority and controlling owners and members since the entities' inception. Id. "The main activity of all of these businesses has always been to manufacture, distribute, and sell and promote 'Kiva Confections' and its products." Id.

Indica made its first sales of cannabis-infused chocolate in December 2010. Id. ¶ 13. In 2015, KBI expanded its business to Arizona, Nevada, Illinois, Hawaii and Michigan. Id. ¶ 14. Mr. Palmer declares that since 2010, KBI has used both "KIVA" and "KIVA CONFECTIONS" on its products, and that there has never been a strategic change in how often KBI uses one or the other. Id. ¶ 15. KBI has sold millions of units, including 1,705,000 units in California in 2018. Id. ¶ 18. It has a marketing budget of $6.5 million for the 2019 year. Id. "Over the past several years," KBI registered the KIVA mark on the

---

[3] KHB points out that Indica still exists as an active California company. KHB Reply (dkt. 69) at 5 n.4. KBI's attorney declares that as a CNMBC, Indica can only be sold to a non-profit. See Chigbu Decl. (dkt. 67-1) ¶ 6.

4

state level in California and other states. Id. ¶ 20, Ex. H.[4] A California trademark issued on January 20, 2018, for the KIVA mark for "Chocolate and confections, all of the foregoing containing cannabis," and states a first use date of December 1, 2010. Palmer MPI Decl. Ex. H.

### C. The Conflict Between the Parties

Mr. Henderson declares that he learned about KBI while at a food industry trade show in California around June 2015. Henderson Decl. ¶ 15. A vendor approached him and asked whether KHB was the same as a company doing business as "Kiva Confections," "a marijuana company in California." Id. After the show, Mr. Henderson researched Kiva Confections on the internet. Id. ¶ 16. Upon reviewing KBI's website and social media, and searching on Google, he "understood that 'Kiva Confections' seemed to be a small company that sold edible products that contained marijuana (for medical use only at that time), exclusively or primarily in the San Francisco Bay Area." Id.

In late 2016 or early 2017, KHB's customers began expressing confusion about KHB and "Kiva Confections." Id. ¶ 17. The number and severity of customers' concerns increased through 2017 and into 2018. Id. In January of 2017, KHB staff began keeping a customer confusion log. Id. ¶ 18; Ex. 9. On May 5, 2018, KHB's counsel sent a cease and desist letter to KBI about the rise in customer confusion, and demanded that KBI cease infringing the KIVA mark. Henderson Decl. ¶ 22; Ex. 13. Counsel for KBI responded on May 22, 2018, seeking to schedule an amicable resolution. Henderson Decl. ¶ 23; id. Ex. 14. KHB responded on June 5, 2018, proposing a mediation. Henderson Decl. ¶ 24; id. Ex. 15. KBI responded on July 24, stating that mediation would be premature. Henderson Decl. ¶ 25; id. Ex. 16.

KHB brought suit in September 2018 for trademark infringement, unfair

---

[4] In addition, in 2017, KBI filed a USPTO "intent to use" application seeking a registration for the KIVA mark for "a website featuring health, wellness and nutrition information . . . all in the field of herbal remedies, medical benefits of cannabis, medical cannabis strains . . . and effects of medic[al] cannabis." See Amended Counterclaim ¶ 28.

5

1  competition in violation of the Lanham Act, declaratory relief, and unfair and deceptive
2  trade practices under state law. See generally Compl. (dkt. 1). It served the Complaint in
3  December 2018, see Waiver of Service Executed (dkt. 4), after the parties held a structured
4  mediation in November and December 2018, see KHB Reply re MPI (dkt. 27) at 4. KBI
5  filed counterclaims. See Counterclaims (dkt. 8); Amended Counterclaims (dkt. 10). KHB
6  then filed a motion for preliminary injunction in March 2019, seeking to enjoin KBI from
7  any further use of the KIVA mark. See KHB MPI (dkt. 12-2). That same filing also
8  includes a motion to dismiss two of KBI's counterclaims. See id. In May 2019, KBI filed
9  a cross-motion for preliminary injunction, seeking to enjoin KHB from using the KIVA
10 mark within California. See KBI MPI (dkt. 25-1) at 1. The parties conducted expedited
11 discovery on the issues raised by the preliminary injunction motions. See Motion to
12 Expedite (dkt. 14); Order on MPI (dkt. 16). That expedited discovery included a
13 deposition of Mr. Henderson in which he answered questions about his knowledge of KBI.
14 See Henderson Decl. Ex. 1 (deposition excerpts).

The case was transferred to this Court in June 2019. See Case Transferred In (dkt. 31). On September 6, 2019, the Court denied the parties' respective preliminary injunction motions, and granted KHB's motion to dismiss KBI's federal Lanham Act claims. See Order re MPIs. Following an unsuccessful settlement conference, see Settlement Conference (dkt. 60), the Court directed the parties to file their summary judgment motions, see Order Vacating CMC.

The Court held a motion hearing on February 7, 2020, as to KHB's motion for partial summary judgment on KBI's affirmative defenses of laches, prior use, acquiescence, waiver, and estoppel, as well as KBI's motion for partial summary judgment on KBI's affirmative defense of laches. Motion Hearing (dkt. 71).

## II. LEGAL STANDARD

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

A fact is material if it could affect the outcome of the case under governing law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute of material fact is genuine if the evidence, viewed in the light most favorable to the nonmoving party, "is such that a reasonable jury could return a verdict for the nonmoving party." Id.

The party moving for summary judgment bears the initial burden of identifying those portions of the pleadings, discovery, and affidavits that demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Where the moving party has the burden of proof at trial on an issue, as in KBI's motion, the moving party must affirmatively show that no reasonable jury could find other than in the moving party's favor. Id. at 331 (Brennan, J., dissenting). Where the nonmoving party has the burden of proof at trial, as in KHB's motion, "the moving party may discharge its burden of production by either (1) negating an essential element of the opposing party's claim, or (2) showing that there is an absence of evidence to support the nonmoving party's case." Synoptek, LLC v. Synaptek Corp., No. 16-1838-CJC (JCGx), 2018 WL 3359017, at *4 (C.D. Cal. June 4, 2018) (citing Adickes v. S.H. Kress & Co., 398 U.S. 144, 158–60 (1970) and Celotex, 477 U.S. at 325).

Once the moving party meets its initial burden, the nonmoving party must go beyond the pleadings and show that there is a genuine issue for trial. Anderson, 477 U.S. at 250. It can do this by citing to specific parts of the materials in the record or by showing that the materials cited by the moving party do not compel a judgment in the moving party's favor. Fed. R. Civ. P. 56(c). The opposing party may also object to the movant's evidence. Synoptek, 2018 WL 3359017, at *4 (citing Fed. R. Civ. P. 56(c)(2)).[5]

### III. DISCUSSION

Both parties have filed motions for summary judgment about KBI's affirmative defenses. This Order addresses the defenses of (A) laches, (B) prior use, and (C) acquiescence, waiver, and estoppel.

---

[5] KBI has done so. See KBI Objections (dkt. 70). This Order does not rely on any of the documents objected to.

7

**A.     Laches**

KBI's fourth affirmative defense is that KHB's trademark claims are barred by laches. Counterclaims at 5. Both parties have moved for summary judgment on KBI's laches defense. See KBI MSJ; KHB MSJ at 15–24. "'Laches is an equitable limitation on a party's right to bring suit.'" Jarrow Formulas, Inc. v. Nutrition Now, Inc., 304 F.3d 829, 835 (2002) (quoting Boone v. Mech. Specialties Co., 609 F.2d 956, 958 (9th Cir. 1979)). It is a defense to both Lanham Act claims and related state law claims. Id. at 835. The principle behind laches is that "'one who seeks the help of a court of equity must not sleep on his rights.'" Id. (quoting Piper Aircraft, Corp. v. Wag-Aero, Inc., 741 F.2d 925, 939 (7th Cir. 1984) (Posner, J., concurring)). To establish laches, a defendant must show "an unreasonable delay by plaintiff in bringing suit, and . . . prejudice to [it]self." Miller v. Glenn Miller Prods., Inc., 454 F.3d 975, 997 (9th Cir. 2006). Determining whether a plaintiff delayed unreasonably consists of (1) assessing the length of the delay and then (2) determining whether the delay was reasonable. Jarrow Formulas, 304 F.3d at 838. The problem here is in determining the length of the delay.

**1.     Length of Delay**

The Court must establish the length of the delay "measured from the time plaintiff knew, or in the exercise of reasonable diligence, should have known about its potential cause of action." adidas-Am., Inc. v. Payless Shoesource, Inc., 546 F. Supp. 2d 1029, 1069 (D. Or. 2008) (citing Jarrow Formulas, 304 F.3d at 838–39). The Court stops the clock on delay "when the lawsuit in which the defendant seeks to invoke the laches defense is initiated." Eat Right Foods Ltd. v. Whole Foods Mkt., Inc., 880 F.3d 1109, 1116 (9th Cir. 2018).

Tchad Henderson of KHB declares that he first learned about KBI while at a food industry trade show in California around June 2015. Henderson Decl. ¶ 15. KBI had an opportunity to depose Mr. Henderson on the matter, and his deposition testimony is consistent with his declaration. See Henderson Opp'n Decl. (dkt. 66-1) ¶ 4, Ex. 1 (Henderson Tr. 48:9–1, 49:21–25, 64:21–66:18, 66:24–68:2, 68:19–69:18). KHB

therefore argues that the earliest the delay period could begin is June 2015. KHB MSJ at 16.

Although KBI's own motion for summary judgment assumes a date of no later than June 2015, see KBI MSJ at 6 ("all occurred in June 2015. . . . KHB filed this lawsuit . . . more than three years later."), KBI argues in opposing KHB's motion that "[a] genuine dispute of material fact exists as to whether KHB had actual knowledge of KBI's use of the KIVA mark prior to June 2015," KBI Opp'n (dkt. 67) at 15 (emphasis added). KBI argues that Mr. Henderson admitted to searching online for other companies using the name KIVA in 2009, 2010, and 2013, that he "[c]onveniently . . . replaced the two computers that he would have used to conduct those searches," and that "it is doubtful that Mr. Henderson did not find at least KBI's website by 2013." Id. at 15–16. It asserts that "[a] reasonable jury could find that Mr. Henderson is not telling the truth and that he did have actual knowledge[6] of KBI's use of the KIVA mark in 2013, if not before." Id. at 16.

Simply asserting that Mr. Henderson might be lying would not be enough to demonstrate "specific facts showing that there is a genuine issue for trial." See Anderson, 477 U.S. at 256; see also Galen v. County of Los Angeles, 477 F.3d 652, 658 (9th Cir. 2007) ("Bald assertions that genuine issues of material facts exist are insufficient); Burrell v. Cty. of Santa Clara, No. 11-cv-4569-LHK, 2013 WL 2156374, at *31 (N.D. Cal. May 17, 2013) (declaration asserting that opponent's "position is false and disputed" does not create triable fact dispute). But there is some possibility that a jury could look at the evidence of early Kiva Confections websites, see Palmer MSJ Decl. Exs. A, B, C, and early Kiva Confections Facebook pages, see Palmer MSJ Decl. Exs. G, H, I—minimalist though they be—and conclude that KHB should have been concerned about the threat of consumer confusion from KBI as early as 2013. The Court is aware of no evidence of consumer confusion until mid-2015, when the trade show participant spoke with Mr. Henderson, and so it is unclear even that the delay period should begin in June 2015. See

---

[6] KBI cannot argue that Mr. Henderson had constructive knowledge of KBI's use of the mark, because KBI had no federal or state trademark registrations at that time.

6 McCarthy on Trademarks and Unfair Competition § 31:19 (5th ed) ("Laches is measured from the date when there was an infringing use sufficient to require legal protest and possible lawsuit"; "no obligation to sue until 'the likelihood of confusion looms large'"); Synoptek, 2018 WL 3359017, at *7 ("not required to constantly monitor every nook and cranny of the entire nation and to fire both barrels of its shotgun instantly upon spotting a possible infringer."). Nonetheless, the Court will permit a jury to decide when the delay period should begin.

As for the end of the delay period, KHB's counsel sent a cease and desist letter to KBI on May 5, 2018. Henderson Decl. ¶ 22; Ex. 13. KHB takes the position that its cease and desist letter "stopped the laches period." KHB Opp'n (dkt. 66) at 13 (citing Elvis Presley Enters., Inc. v. Capece, 141 F.3d 188, 205 (5th Cir. 1998)).[7] But the Ninth Circuit does not stop the clock at the filing of a cease and desist letter; it stops the clock "when the lawsuit . . . [was] initiated." Eat Right Foods, 880 F.3d at 1116. That was in September 2018. See Compl. Because the Court does not herein decide the start of the delay period, it cannot calculate the total length of the delay period.

### 2. Reasonableness of Delay

The next determination is whether the delay was reasonable. Jarrow Formulas, 304 F.3d at 838. That inquiry is based on (1) the analogous statute of limitations, and (2) the factors articulated in E-Systems, Inc. v. Monitek, Inc., 720 F.2d 604 (9th Cir. 1983). See Synoptek, 2018 WL 3359017, at *5–*7. Because the Court has not determined the length of the delay, it cannot conduct a proper E-Systems analysis. See, e.g., E-Systems, 720 F.2d at 607 (requiring consideration of "plaintiff's diligence in enforcing mark" and "extent of harm suffered by junior user because of senior user's delay"). However, the Court makes the following holding as to the limitations period.

Courts are to decide whether a delay is reasonable "in reference to the limitations

---

[7] KHB correctly notes that, in the Ninth Circuit, delays attributable to parties' negotiations before filing suit are not unreasonable. See KHB Opp'n at 13 (citing Toyota Motor Sales, U.S.A., Inc. v. Tabari, 610 F.3d 1171, 1183 (9th Cir. 2010)). But that goes to reasonableness (the next prong), not when the clock stops.

10

1  period for the analogous action at law." Jarrow Formulas, 304 F.3d at 835. If a plaintiff
2  has brought suit within the analogous limitations period, then there is a "strong
3  presumption" that laches does not apply. Id. at 835–36. If a plaintiff has brought suit
4  outside of the analogous limitations period, the presumption is reversed. Id. at 836, 838. It
5  "is extremely rare for laches to be effectively invoked when a plaintiff has filed his action
6  before limitations in an analogous action at law has run." Shouse v. Pierce Cty., 559 F.2d
7  1142, 1147 (9th Cir. 1977). The Lanham Act has no statute of limitations, and so courts
8  are to "'borrow' the limitations period from the most closely analogous action under state
9  law." Jarrow Formulas, 304 F.3d at 836. But there is some uncertainty in the Ninth
10 Circuit about what the appropriate state law action, and therefore statute of limitations, is.
11 KHB argues for a four-year statute of limitations, see KHB Opp'n at 10, while KBI argues
12 for a two-or-three-year statute of limitations, see KBI MSJ at 7.

   There is good reason to use the California trademark infringement law's four-year
statute of limitations. The 2002 case of Jarrow Formulas involved claims of "false and
deceptive advertising" under the Lanham Act. 304 F.3d at 834–35. The parties in that
case agreed that the analogous limitations period was California's three-year period for
fraud. Id. at 838. Since then, however, the Circuit has largely employed a four-year
period—particularly where, as here, the claims do not involve fraud. In Miller v. Glenn
Miller Prods., Inc., 454 F.3d 975, 997 (9th Cir. 2006), the parties agreed on a four-year
statute of limitations. The Circuit explained that California's "statute of limitations for . . .
state trademark infringement and/or dilution claims . . . is four years," and that the
"analogous state statute of limitations . . . are state trademark infringement and dilution
claims under Cal. Bus. & Prof. Code § § 14330 and 14335." Id. (citing Jarrow Formulas,
304 F.3d at 836–37). In 2009, the Ninth Circuit stated in Internet Specialties West v.
Milon-Digiorgio Enters., Inc., 559 F.3d 985, 990 n.2 (9th Cir. 2009), that the parties had
agreed on a "four-year limitations period from California trademark infringement law,"
although—notably—the court added: "we agree that this was the correct period to use."
   True enough, the following year, in Au-Tomotive Gold Inc. v. Volkswagen of

11

America, Inc., the Ninth Circuit applied a three-year limitations period, but it did so because the court was tasked with finding the analogous state law in Arizona, and "'Arizona's directly analogous law is its state trademark law, which does not contain a statute of limitations.'" 603 F.3d 1133, 1140 (9th Cir. 2010) (quoting Ranch Realty, Inc. v. DC Ranch Realty, LLC, 614 F. Supp. 2d 983, 989 (D. Ariz. 2007). The court therefore used a three-year statute of limitations based on Arizona's fraud statute. Id. A court in this district noted in 2015 that "For years, the Ninth Circuit and district courts in California have almost universally assumed the answer is the four-year limitations periods contained in California Code of Civil Procedure Sections 337 or 343," but it found "meritorious" the argument that "none of [those] cases actually analyze the question in depth." Fitbug Ltd. v. Fitbit, Inc., 78 F. Supp. 3d 1180, 1189–90 (N.D. Cal. 2015). Notwithstanding that court's criticism, the Circuit recently reiterated that "[t]he most analogous state statute of limitations in this case is California's four-year statute of limitations for trademark infringement actions." Pinkette Clothing, Inc. v. Cosmetic Warriors Ltd, 894 F.3d 1015, 1025 (9th Cir. 2018) (citing Internet Specialties, 559 F.3d at 990 n.2). KBI's counsel conceded at the motion hearing that Pinkette was the last word on the subject.

Accordingly, the Court will follow the weight of the authority in the Circuit and hold that the most analogous California law for KHB's Lanham Act claims is California's trademark infringement statute, which carries with it a four-year limitations period. If KHB brought suit within the four-year statute of limitations, there is a strong presumption that laches would not apply. See Jarrow Formulas, 304 F.3d at 835–36. But the Court does not determine if the presumption applies, nor does it reach the E-Systems factors to determine if such a presumption should hold, nor does it reach the issue of prejudice. A dispute of material fact as to the length of the delay prevents the Court from conducing the necessary analysis on laches. Accordingly, KBI's motion for summary judgment is DENIED in its entirety and KHB's motion for summary judgment is DENIED as to laches.

12

**B. Prior Use**

KBI's third affirmative defense is that KHB's trademark claims are barred because "KBI is the senior user of the KIVA and KIVA CONFECTIONS trademarks in the relevant markets." Counterclaims at 5. KHB moves for summary judgment on this "prior use" counterclaim, arguing that KBI has no cognizable claim of senior use because KBI's products are illegal under federal law and that KBI, which was not formed until 2014, cannot demonstrate that it continuously used the KIVA mark before KHB filed its 2013 federal trademark application. KHB MSJ at 9.

The Court addressed similar arguments at the motion for preliminary injunction stage. See Order re MPIs at 8. The Court concluded as to continuous use—i.e., whether KBI can connect its current use of the KIVA mark to Indica's earlier use—that "[g]iven Palmer's uncontested testimony that the main business of Indica and KBI has always been to sell KIVA confections, that he and Knoblich maintained full control over Indica, KBI, and their affiliates, and that they were the 'majority and controlling owners/members since the entities' inception,' . . . there is probably a sufficient basis to conclude that there was an implied assignment" of the KIVA mark from Mr. Palmer and Ms. Knoblich to Indica. Id. at 10–11. The Court found more persuasive KHB's argument about unlawful first use, concluding that "the illegality of KBI's products under federal law renders KBI unable to challenge KHB's federal trademark." Id. at 16–17.

The Court again will focus on unlawful first use, as there appear to be genuine disputes of material fact as to whether KBI can trace a chain of title to the KIVA mark from Indica. Although unlawful first use presents a relatively novel legal question, it is at least a purely legal question. The Court will address (1) the issue of KBI's prior use of the mark on federally-illegal products, and (2) KBI's argument that 15 U.S.C. § 1065 requires a different result than the Court reached earlier.

**1. Lawful First Use**

As the Court held in connection with the MPIs, while KBI's product is legal under

13

California law, its illegality under federal law means that KBI cannot have trademark priority. Order re MPIs at 12–17. The Court held:

> To register a trademark, an applicant must show that the mark "is in use in commerce" or that the applicant has a "bona fide intention to use the mark in commerce[.]" 15 U.S.C. § 1051(a)(3)(C); 15 U.S.C. § 1051(b)(3)(B). "[P]riority ordinarily comes with earlier use of a mark in commerce." Grupo Gigante SA De CV v. Dallo & Co., Inc., 391 F.3d 1088, 1093 (9th Cir. 2004). Importantly, though, the USPTO and the Ninth Circuit have held that the "use in commerce" must be a lawful use. See, e.g., S. Cal. Darts Ass'n v. Zaffina, 762 F.3d 921, 931 (9th Cir. 2014) ("only lawful use in commerce can give rise to trademark priority"); CreAgri, Inc. v. USANA Health Scis., Inc., 474 F.3d 626, 630 (9th Cir. 2007) (agreeing with "the PTO's policy . . . that only lawful use in commerce can give rise to trademark priority"); In re Morgan Brown, 119 U.S.P.Q. 2d 1350 (T.T.A.B. July 14, 2016) ("We have consistently held that, to qualify for a federal service mark registration, the use of a mark in commerce must be 'lawful'. . . . Thus, any goods or services for which the mark is used must not be illegal under federal law."). The Ninth Circuit explained that "to hold otherwise would be to put the government in the 'anomalous position' of extending the benefits of trademark protection to a seller based upon actions the seller took in violation of that government's own laws." CreAgri, 474 F.3d at 630 (quoting In re Stellar Int'l, 159 U.S.P.Q. 48, at *3 (T.T.A.B. July 30, 1968)).[] The lawful use requirement is applicable to senior user claims. See id. at 634. It is also applicable to a claim for cancellation of a registered mark. See GoClear LLC v. Target Corp., No. C 08-2134 MMC, 2009 WL 160624, at *3 (N.D. Cal. Jan. 22, 2009).
>
> KHB asserts that the KBI and Indica products bearing the KIVA mark were "all infused with cannabis." KHB MPI at 13 (quoting Amended Counterclaim ¶ 5). And it asserts that, whatever its status under state law, "marijuana remains illegal for all purposes under federal law." See id. (citing Trademark Laundering, Useless Patents, and Other IP Challenges for the Marijuana Industry, 73 Wash. & Lee L. Rev. 217, 219 (Winter, 2016); Trademark Manual of Examining Procedure § 907 (2018) ("Use of a mark in commerce must be lawful use to be the basis for federal registration of the mark. . . . [the Controlled Substances Act] makes it unlawful to manufacture, distribute, or dispense a controlled substance [or] possess a Schedule I controlled substance. . . . regardless of state law, marijuana [and] marijuana extracts . . . remain Schedule I controlled substances under federal law and are subject to the CSA's prohibitions"); 21 U.S.C. § 812(c)(10) (listing "[m]arihuana" in Schedule I)).

> KHB is correct. See, e.g., Trademark Laundering, 73 Wash. & Lee L. Rev. at 245–46 ("The illegality doctrine thus poses great, possibly insurmountable, problems for the marijuana industry. So long as marijuana remains illegal under federal law, marijuana businesses cannot demonstrate that they are engaged in lawful commerce, and their applications for trademarks are now routinely denied. . . ."). In re Morgan Brown, 119 U.S.P.Q. 2d [1350] at *2–3, involved an attempt to register the mark "HERBAL ACCESS" for "retail store services featuring herbs" where the store's services included the provision of marijuana, "an illegal substance . . . in violation of the [CSA]." The Trademark Trial and Appeal Board explained that "[r]egardless of individual state laws that may provide for legal activities involving marijuana, marijuana . . . remain[s a] Schedule I controlled substance[] under federal law[.]" Id. at *3. Because a store selling a good that is illegal under federal law is "a use that is unlawful," the Board affirmed the refusal to register the mark. Id. at *5. In a similar case, the Board also affirmed the refusal to register the marks "POWERED BY JUJU" and "JUJU JOINTS" for smokeless marijuana or cannabis vaporizing apparatuses, "based upon lack of lawful use of the mark in commerce[.]" In re JJ206, LLC, DBA Juju Joints, 120 U.S.P.Q. 2d 1568, at *1 (T.T.A.B. Oct. 27, 2016). The Board explained that "where the identified goods are illegal under the federal [CSA], the applicant cannot use its mark in lawful commerce[.]" Id. at *2. It reiterated that even if the goods are lawful under state law, that is "irrelevant to the question of federal registration when it is unlawful under federal law." Id. at *3 (quoting In re Morgan Brown, 119 U.S.P.Q. 2d 1350, at *1). Though the applicant argued that a series of policy ills would follow the refusal to grant trademark protection to marijuana-related goods and services, including that such businesses would suffer infringement, the Board responded that it "cannot simply disregard the requirement of lawful use[.]" Id. at *4.

Id. at 12–14.

The Court considered and rejected KBI's argument that "KHB's trademark does not trump the valid rights KBI acquired under state law," summarizing as follows:

> While KBI is only asserting California common law rights to the KIVA mark, see KBI MPI at 7, it is doing so as a defense to a federal trademark claim, see Compl. ¶¶ 24–33 (trademark infringement claim); KHB MPI at 6 (asserting likelihood of success on trademark infringement claim). That defense relies on KBI's prior use of the mark. See Sengoku Works, 96 F.3d at 1219 ("To acquire ownership of a trademark . . . the party claiming ownership must have been the first to actually use the mark in the sale of goods or services."); CreAgri, 474 F.3d at 630 ("only lawful use in commerce can give rise to trademark priority"). KBI's prior use was illegal under federal law. See Palmer Decl. ¶ 4 (all KBI products contain cannabis); In re Morgan Brown, 119 U.S.P.Q. 2d [1350] at *3 ("Regardless of

15

> individual state laws that may provide for legal activities involving marijuana, marijuana . . . remain[s a] Schedule I controlled substance[] under federal law . . . ."). KBI therefore did not make lawful prior use of the mark. See S. Cal. Darts Ass'n, 762 F.3d at 931. To hold that KBI's prior use of the KIVA mark on a product that is illegal under federal law is a legitimate defense to KHB's federal trademark would "put the government in the anomalous position of extending the benefits of trademark protection to a seller based upon actions the seller took in violation of that government's own laws." See CreAgri, 474 F.3d at 630 (internal quotation marks omitted).

Id. at 16.

### 2. Section 1065 and Section 1115(b)(5)

KBI acknowledges the Court's previous ruling on this issue, but insists that it is making a different argument here. See KBI Opp'n at 5. KBI argues that "there are two separate, but similar, 'prior use' defenses available under the Lanham Act – 15 U.S.C. § 1065 . . . and 15 U.S.C. § 1115(b)(5)." Id. at 4 (citing Newmark Realty Capital, Inc. v. BGC Partners, Inc., No. 16-cv-1702-BLF, 2017 WL 8294175, at *7 (N.D. Cal. Nov. 16, 2017)). It accuses KHB of "ignor[ing] Section 1065," which "expressly states that it applies where 'the use of a mark registered on the principal register infringes a valid right acquired under the law of any State[.]'" Id. (citing 15 U.S.C. § 1065). KBI relies entirely on Section 1065. See, e.g., id. at 4 ("Numerous cases have confirmed that the prior use defense under Section 1065 focuses on the defendant's trademark rights under state law"); id. at 5–6 ("Since the Court was not previously asked to consider Section 1065, KHB's reliance on the Court's previous suggestion that 'KBI's prior use of the KIVA mark on a product that is illegal under federal law is [not] a legitimate defense to KHB's federal trademark' is misplaced.").[8]

But Section 1065 pertains only to incontestable marks. See 15 U.S.C. § 1065 (title of section is "Incontestability of right to use mark under certain conditions"); id. ("except to the extent . . . to which the use of a mark . . . infringes a valid right acquired under the

---

[8] KBI's prior use Counterclaim itself does not cite to a specific section: it states only that "KBI is the senior user" of the mark. Counterclaims at 5.

16

law of any State . . . the right of the owner to use such registered mark . . . shall be incontestable.").[9] KHB has not obtained and is not asserting incontestable status. See KHB Reply at 1. Accordingly, the prior use defense that KBI asserts here comes from Section 1115, which describes defenses to both incontestable and (as here) ordinary federally registered trademarks, and which does not include the language KBI relies on from Section 1065 about state law. See 15 U.S.C. § 1115. KBI's authority and arguments about incontestable marks are therefore inapposite.

KHB argues, moreover, that whether Section 1065 or Section 1115 applies, it is not the law that a federally illegal use—even if legal under state law—could support a prior use defense to a federal trademark. See KHB Reply at 2. The Court agrees. KBI is correct that "'The Lanham Act does not have a broad preemptive impact.'" See KBI Opp'n at 6 (quoting Morton & Bassett, LLV v. Organic Spices, Inc., No. 15-cv-1849-HSG, 2017 WL 1425908, at *9 (N.D. Cal. Apr. 21, 2017)). It is true that since Golden Door, Inc. v. Odisho, 646 F.2d 347, 352 (9th Cir. 1980), it has been the law in the Ninth Circuit that the Lanham Act does not preempt the field of trademark law. Indeed, "[i]n general, federal and state trademark and unfair competition law can coexist and cooperate without conflict." McCarthy § 22:2.

But Golden Door also explained that the Lanham Act can preempt state law in certain circumstances. The Circuit agreed that "'the Lanham Act expresses a Congressional design to legislate so that the public can buy with confidence,'" and that "'[i]f state law would permit confusing or deceptive trademarks to operate, infringing on the guarantee of exclusive use to federal trademark holders, then the state law would, under the Supremacy Clause, be invalid.'" Golden Door, 646 F.2d at 352 (quoting

---

[9] In Casual Corner Assocs., Inc. v. Casual Stores of Nevada, Inc., 493 F.2d 709, 713 (9th Cir. 1974), which KBI cited at the motion hearing, the court explained that the appellant was "precluded from claiming any rights arising out of the exception to section 1065" because it had not demonstrated five years of continuous use in order to gain incontestable status; accordingly, it could "raise only those defenses specifically enumerated in section 1115."

17

Mariniello v. Shell Oil, 511 F.2d 853, 858 (3d Cir. 1975)). The court wrote in Morton & Bassett that "Golden Door has been understood to mean that '[t]he Lanham Act . . . only preempts state laws which would provide less protection than the Lanham Act, and thus would permit federal trademarks to be infringed.'" 2017 WL 1425908, at *9 (quoting Kerzner Int'l Ltd. v. Monarch Casino & Resort, Inc., 675 F. Supp. 2d 1029, 1049 (D. Nev. 2009)). In International Franchise Association, Inc. v. City of Seattle, 803 F.3d 389, 409 (9th Cir. 2015) cert. denied sub nom. Int'l Franchise Ass'n, Inc. v. City of Seattle, Wash., 136 S. Ct. 1838 (2016), the Ninth Circuit reaffirmed that a City's ordinance could "only be preempted if it conflicts with the Lanham Act." If the ordinance "interfere[s] with . . . [the] ability to maintain quality, compromise[s] the public's confidence in trademarks, allow[s] misappropriation, or directly interfere[s] with or regulate[s] marks," the Lanham Act would preempt it. Id. at 410; see also McCarthy § 22:2 ("when state rules conflict with federal law, the federal trademark law preempts state rules.") (citing as an example Minuteman Press Int'l, Inc. v. Minute-Men Press, Inc., 219 U.S.P.Q. 426 (N.D. Cal. 1983) (holding that state law cannot narrow the rights of a junior federal registrant)).

Cannabis is illegal under federal law. In re Morgan Brown, 119 U.S.P.Q. 2d 1350, at *3 ("marijuana . . . remain[s a] Schedule I controlled substance[] under federal law . . . ."). When a mark is used for cannabis products, the Lanham Act does not recognize the user's trademark priority. See id., 119 U.S.P.Q. 2d 1350, at *5; In re JJ206, 120 U.S.P.Q. 2d 1568, at *2–*3; CreAgri, 474 F.3d at 630. California law, however, does not prevent a user from securing common law rights to a mark when the mark is used for cannabis products. Because the state law that allows KBI a common law right in the KIVA mark would encroach on KHB's federal trademark rights (thereby permitting a confusing trademark to operate and "infringing on the guarantee of exclusive use" to the federal trademark holder), the Lanham Act preempts the state law. See Golden Door, 646 F.2d at 352. KBI cannot be the senior user of the KIVA mark.

Accordingly, the Court GRANTS KHB's motion for summary judgment on KBI's prior use defense.

18

## C. Acquiescence, Waiver, and Estoppel

KBI's fifth affirmative defense is that KHB's claims are barred by waiver; its sixth affirmative defense is that KHB's claims are barred by estoppel; and its seventh affirmative defense is that KHB's claims are barred by acquiescence. Counterclaims at 5. KHB moves for summary judgment on all three, arguing that all require the "expression or conduct by a trademark plaintiff demonstrating that the plaintiff either explicitly or implicitly permitted a defendant to engage in a use of the plaintiff's mark." KHB MSJ at 24. KHB argues that "[b]ecause there is no evidence that [KHB], either by act or omission, engaged in any conduct allowing KBI to use 'KIVA' in connection with its products, all these equitable defenses fail." Id. at 25.

But KBI asserts that "[t]here has been no discovery at all with respect to these defenses," because the expedited discovery only addressed issues at the preliminary injunction stage, which did not include acquiescence, waiver or estoppel. KBI Opp'n at 23 (citing Schuman Decl. (dkt. 67-3) ¶ 6). While the Court is aware of no evidence supporting the acquiescence, waiver, and estoppel defenses, it would be premature to grant summary judgment before KBI has been allowed discovery on them.

Accordingly, the Court DENIES the KHB motion for summary judgment on these defenses.

## IV. CONCLUSION

For the foregoing reasons, the Court DENIES KBI's motion for summary judgment on its laches defense, and GRANTS IN PART AND DENIES IN PART KHB's motion for summary judgment (granting as to the prior use defense; denying as to the laches, acquiescence, waiver and estoppel defenses).

**IT IS SO ORDERED.**

Dated: February 14, 2020

CHARLES R. BREYER
United States District Judge